BARRETT S. LITT, SBN 45527
Email: blitt@kmbllaw.com
RONALD O. KAYE, SBN 145051
Email: rok@kmbllaw.com
KEVIN J. LaHUE, SBN 237556
KAYE, McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys for Plaintiff
ANDREW WILSON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW WILSON,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LOS ANGELES; COUNTY OF LOS ANGELES; RICHARD MARKS; AND DOES 1-10, INCLUSIVE;<br><br>Defendants. | CASE NO.<br><br>**(1) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, *MANSON/BIGGERS* VIOLATIONS;**<br><br>**(2) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, *BRADY* VIOLATIONS;**<br><br>**(3) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1983, FABRICATION OF EVIDENCE;**<br><br>**(4) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, *MONELL* VIOLATIONS, CITY OF LOS ANGELES;**<br><br>**(5) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1983, *MONELL* VIOLATIONS, COUNTY OF LOS ANGELES**<br><br>**DEMAND FOR JURY TRIAL.** |

1

## I.      JURISDICTION AND VENUE

1.      This action is brought by Andrew Wilson ("Plaintiff" or "Wilson") pursuant to 42 U.S.C. §1983.

2.      This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983, and under 28 U.S.C. §1331.

3.      The acts and omissions complained of commenced on October 23, 1984 and continued until March 16, 2017 within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

## II.     INTRODUCTION

4.      In 1984, at the age of 29, Andrew Wilson was arrested and charged with the robbery felony-murder of Christopher Hanson, a crime he did not commit. The sole evidence directly connecting Mr. Wilson to the murder was the eyewitness testimony of a witness to the murder, whose testimony (unknown to defense counsel) was the product of Defendant LAPD Detective Richard Marks pointing out Mr. Wilson after she failed to identify him on several occasions. Mr. Wilson was sentenced to life imprisonment without the possibility of parole. Now 63 years-old, Mr. Wilson has spent the last thirty-four years steadfastly asserting his innocence and fighting to prove it.

5.       The crime occurred the evening of October 23, 1984, when Christopher Hanson was stabbed while he slept with his girlfriend, Saladena Bishop (a family acquaintance of Wilson), in a parked car. Hanson suffered from Von Willebrand's disease, a blood disorder preventing his blood from clotting and, as a result, succumbed to his wounds before paramedics arrived.

6.      No physical evidence tied Wilson to the crime: none of the finger or palm prints recovered from the scene matched Wilson, and no blood or DNA was found implicating Wilson.

1

7.     On the night of the murder, Bishop was shown "mug books" containing photos of various individuals. These mug books contained at least one photo of Wilson. Although this was within hours of the murder, and although Bishop later stated that she recognized Wilson in the photos (whom she had known since she was a child), she did not identify Wilson as being involved in the Hanson murder or as resembling in any way the person she saw commit the Hanson murder. Bishop also failed to tell law enforcement she knew him or his family personally.

8.     On November 20, 1984, approximately one month after his son's murder, Christopher Hanson's father, Arthur Hanson, contacted Defendant Marks and told him he located a potential eyewitness named Clarence Pace. Marks met with Pace, who purportedly said he saw a man who resembled Wilson in the neighborhood the night Hanson was killed. While Pace told Marks that the man he saw looked like Wilson, he also told Marks he "was not sure at all" that Wilson was the person he saw, and the man he saw was wearing clothing that did not match the clothing description of the murderer that Bishop provided to police. Pace also definitively excluded another man, Frederick Terrell, Wilson's longtime associate, as being present that evening. Marks later admitted that he "structured" the interview so that Pace would not exclude Terrell—albeit unsuccessfully. In a subsequent interview with the district attorney, Pace questioned why Marks "had it in for Terrell" and stated Marks "pushed him hard" to identify Terrell.

9.     On November 29, 1984, more than a month following the killing, as a result of the Pace interview, Marks showed Bishop a 16-photo spread that included Wilson's photo. Marks testified at trial that, although he didn't tell Bishop anybody was under arrest at this point: "I think it's fair to say she realized these photos weren't randomly selected and put into this photo line."

10.    Bishop initially could not identify anyone in the photospread.  Marks then "directed Bishop's attention" (Marks' words) to Wilson's photo. Only *after* the direction from Marks did Bishop select Wilson's photo with what was described as

2

80% certainty. An arrest warrant was issued for Wilson and he surrendered himself. When interviewed by Marks after the arrest, Wilson clearly stated he was not involved in Hanson murder.

11.    The manipulation of two key eyewitnesses by Marks was never disclosed to Wilson or his counsel at trial. Most critically, a warrant affidavit where Marks admitted he "directed" Bishop's attention to Wilson and a "disposition report" reflecting Marks' "structuring" of the Pace interview was never disclosed to Wilson even during subsequent federal habeas proceedings in 1990.

12.    Additionally, it was never disclosed to the defense that police provided Bishop with a $1,000 payment prior to trial, or that Bishop was believed to have filed a false accusation of rape and murder in another case, or that she had previously attacked Hanson with a knife.

13.    Wilson spent more than 32 years in prison as a result of Defendants' actions. Without Marks' wrongful, unconstitutional conduct of tainting the identification evidence and withholding exculpatory evidence, Wilson would not have been arrested or convicted for the Hanson murder; he would not have spent more than 32 years in prison. The Defendants' conduct violated Wilson's civil and constitutional rights.

14.    On March 8, 2017, after Wilson's petition for writ of habeas corpus was fully briefed before Honorable Laura F. Priver, the Los Angeles District Attorney's Office conceded "that cumulative errors during pre-trial and trial proceedings deprived Mr. Wilson of his constitutional right to a fundamentally fair trial" and stated that "[t]he LADA does not intend to retry Mr. Wilson after the convictions are vacated." Wilson was released from custody on March 16, 2017.

## III.   PARTIES

15.    Plaintiff Andrew Wilson resided within the jurisdiction of the State of California at all times herein alleged.

16.    At times relevant herein, Defendant Richard Marks was employed by and working on behalf of the LAPD and resided within the jurisdiction of the State of California. In his capacity as a LAPD officer, he actively participated in the investigation resulting in the prosecution of Plaintiff Wilson. Defendant Marks is sued in his individual capacity.

17.    Defendant City of Los Angeles is, and at all times herein alleged was, a public entity organized and existing under the laws of the State of California. The Los Angeles Police Department is, and at all times herein alleged was, an agency of the City of Los Angeles.

18.    Defendant County of Los Angeles is, and at all times herein alleged was, a public entity organized and existing under the laws of the State of California. The Los Angeles District Attorney's Office is, and at all times herein alleged was, an agency of the County of Los Angeles.

19.    Plaintiff is informed and believes and thereon alleges that Defendants sued herein as Does 1 through 10, inclusive, were officers of the Los Angeles Police Department, or employees of the Los Angeles District Attorney's Offices and were at all relevant times acting in the course and scope of their employment and agency. Each Defendant is the agent of the other. Plaintiff alleges that each of the Defendants named as a "Doe" was in some manner responsible for the acts and omissions alleged herein, and Plaintiff will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

## IV.    GENERAL ALLEGATIONS

20.    Plaintiff is informed and believes, and thereon alleges, that, at all times herein mentioned, each of the Defendants was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-Defendants.

21. Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this complaint.

22. The acts and omissions of all Defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Plaintiff.

## V. INVESTIGATION

### A. BACKGROUND

23. In 1981, Wilson, his wife Joyce Phillips, and their young daughter Catrina, were living in Los Angeles, after moving from St. Louis to be near friends and family. Joyce lived with family friends on Normandie Boulevard, while Catrina stayed with her "Grandma Mary" during the school week at Mary's home a few blocks away. On the weekends, Wilson, Joyce, and Catrina would spend time together at the home on Normandie Boulevard.

24. Saladena Bishop, who was about 14 years old at the time, lived in the same home on Normandie Boulevard with Joyce (and other relatives) and used to babysit for Catrina regularly when Wilson and his wife went out in the evenings.

25. Joyce, Catrina, and Wilson moved into a guesthouse together behind Grandma Mary's house that was located nearby. Even after Joyce left the house on Normandie Boulevard, Bishop continued to see Wilson and his family. Several months after the Wilson family moved into Grandma Mary's guesthouse, Bishop ran away from home and went to stay with Joyce and Wilson for several days at the guesthouse, until Wilson convinced Bishop to return to her family.

26. In 1984, Wilson, who is right-handed, had two very distinguishing physical features: he was wearing a front gold tooth engraved with a cloverleaf design and he had a prominent patch of white hair on the front of his head about the size of a silver dollar caused by a birthmark on his scalp.

27.     Throughout 1984, Wilson encountered Marks on the streets because Marks would stop Wilson (who was often with his friend Frederick Terrell) and question them about residential burglaries in the area. Marks frequently targeted and harassed Wilson and Terrell. In one incident Marks approached them on the street and yanked the watch off Wilson's arm and the necklace from Terrell's neck and threw them in the sewer, making a statement indicating that Marks believed, erroneously, that the jewelry was stolen.

**B.     MURDER OF CHRISTOPHER HANSON**

28.     At around 9 p.m. on October 23, 1984, Marshaunt Jackson rang the doorbell at 2249 South Hobart Street in Los Angeles, which was occupied by Teen Challenge, an outreach center for drug and alcohol rehabilitation operated by Byron and Laurel Berwick. Byron Berwick answered the door and recognized Jackson, whom Berwick described as being in his mid 20's, black, with kind of bushy hair, five-feet nine inches, and who sometimes had a beard. Berwick told police Jackson was wearing a "button down shirt."

29.     Berwick sent Jackson away, and "about 10 or so minutes later, [he and his wife] heard this loud scream" from the front of the house. Berwick ran outside and saw "a young black girl [Bishop] shouting… 'They beat on him'." Berwick saw two young men who he estimated were about 35 to 40 feet in front of Hanson's truck walking north on Hobart Avenue. Berwick could not say whether Jackson was one of the men he saw walking away from the scene.

30.     Saladena Bishop and her boyfriend, Chris Hanson, had been sleeping in Hanson's truck parked on Hobart Avenue. The location where the car was parked had little traffic and was dark due to the trees and lack of artificial lighting. Bishop stated she was sleeping with her head in Hanson's lap when she awoke to discover a black male leaning through the passenger window reaching over her with something shiny in his hand. She began screaming and saw a second man standing inside the

open driver's side door next to Hanson, hitting him. She only saw each man for a few seconds. Hanson was stabbed multiple times with, what appeared from the wounds to be a knife and a pin / pick instrument, and died before paramedics arrived.

31.     No blood was found on Bishop, on the seats, or elsewhere in the interior of the pick-up truck cab.

### C.     PRE-ARREST INVESTIGATION

#### 1.     Saladena Bishop's Inability to Identify Suspects

32.     Marks responded to a 9-1-1 call about the Hanson stabbing and reached the scene at about 10:30 p.m. At the scene, Marks found a hat and two portions of a broken knife. Two palm prints were lifted from the vehicle; neither matched Wilson or Terrell. No other physical evidence was found.

33.     Bishop testified that the entire incident from the time she woke up until the men walked away lasted "maybe a minute and a half, two minutes." She looked at the face and the hand of the man on the driver's side once. He was holding a knife in his left hand. She was focusing on the knife, looking very closely at the blade, which was four or five inches long. Bishop told Marks she saw only the profile and torso of the man on the driver's side who killed Hanson, and she only saw him for a few seconds. Bishop got a better look at the other man, who was on her side of the truck, the passenger side.

34.     At the time of the Hanson murder, Saladena Bishop was seventeen years old.  She had moved out of her home and was living in multiple locations. She had a history of abuse and possible drug use including "PCP".

35.     Bishop described the driver's side man as "a male black, in his mid-30s, old looking, dark completed, five-seven with a thick mustache, thick lips," wearing "a plaid shirt, blue and burgundy plaid shirt with a gray sweater shirt underneath." She specifically recalled that he wore a "button down shirt." She did not describe either assailant wearing a hat or glasses. She did not describe the person

on the driver's side – the stabber – as having unusual teeth or a gold tooth. She was certain the stabber was not wearing a leather jacket. As elaborated below, this clothing description is completely different from the clothing of the person witness Pace saw running.

36.     Several hours after the murder, at the police station, Marks showed Bishop "mug books" containing photos of various individuals. These mug books contained at least one photo of Wilson. Although this was shortly after the murder, and although Bishop later stated (well after her photospread identification of Wilson as the person she saw stabbing Hanson) that she recognized Wilson in the photos (whom she had known since she was a child) as someone she knew, she did not identify Wilson as being involved in the Hanson murder or as resembling in any way the person she saw commit the Hanson murder after seeing his photo in the mug book on the night of the murder. Nor did she tell law enforcement she knew him or his family personally.

37.     Although, in reviewing the mug books on the night of the murder, Bishop did not pick Wilson as even resembling the murderer, she did pick out four photos of an individual named Johnny McKinney, and she said that she was "almost certain" he was the individual who was on the passenger side of the truck. Bishop's identification of McKinney was incorrect as McKinney was in custody at the time of the Hanson murder. Bishop later made tentative and then positive identifications of Frederick Terrell, which she maintained even after his case was dismissed despite her identification of him.  McKinney and Terrell do not resemble each other.

38.     The next day, on October 25, 1984, Bishop went to the police station and again looked at mug books, which again included Wilson's photo, and Bishop again did not identify him. At this time, Bishop also saw Marshaunt Jackson's photo and told Marks that Jackson had been in an altercation with Hanson four days prior to Hanson's death and that she saw him again two days later at the spot where she

and Hanson parked their vehicle on Hobart Avenue. Marks reviewed Jackson's criminal record, which contained a long history of arrests for theft, burglaries, and shoplifting.

39.     After showing her the mug books, Marks drove Bishop around the community on October 25th in hopes of seeing a suspect. Bishop did not identify anyone during this drive. Three days later, after Bishop had viewed thousands of mug book photos, Bishop assisted in the creation of a composite sketch based on her physical description of the two assailants. These composites were then distributed to police officers in the area in the hopes of identifying suspects. As a result of these composites, officers brought numerous individuals they contacted (not Wilson) to the station that they believed "resembled" the composites. None of these men were ultimately arrested.

40.     On November 2, 1984, nine days after the murder, Marks again took Bishop out on a ride-along in the neighborhood. This time, she identified Walter Gibson, a man sitting on a bus bench, as a possible match for the individual who was on the passenger side of the vehicle. She later recanted this identification when she got a closer look at him and heard him speak.

41.     On November 14 and 15, 1984, Bishop went on two more ride-alongs with Marks but failed to identify anyone. On November 15, 1984, because Bishop described the assailant on the passenger side as having a scar on his cheek, Marks showed Bishop a photo spread labeled "A" depicting mug shots of individuals who had a scar on their left cheek, but she did not identify anyone. Bishop did, however, pick five or six other people from the mug books as possible matches for the person on the passenger side.

1
2

### 2. Clarence Pace Identifies Wilson As Resembling The Person He Saw in the Neighborhood but Claims Frederick Terrell was Not at the Scene

3

42.    Five weeks after the Hanson murder, on November 20, 1984, Arthur

4

Hanson (Christopher Hanson's father), contacted Marks regarding a potential

5

witness named Clarence Pace. Arthur Hanson had been actively conducting his own

6

well-publicized investigation into the case and was offering monetary rewards for

7

those with information about his son's death. Marks interviewed Clarence Pace on

8

November 27, 1984. The interview is not tape-recorded; a statement in Marks'

9

handwriting was signed by Pace.

10

43.    According to Pace's statement written by Marks, the night Hanson was

11

killed he, his cousin Donald Brim, and friend Norval Gully, were walking nearby in

12

the same neighborhood. Pace "saw two male blacks come eastbound on 22nd Street

13

around the corner and then south down the hill toward [Pace]. They were jogging

14

(fast pace) but not really running. When they reached [Pace and his companions],

15

one ran around [them] on the right while the other ran past on the left. They kept on

16

until they got to 23rd Street where they turned east toward Congress. That point they

17

poured it on – a dead run." This was about .3 miles from the murder scene.

18

44.    According to the Pace statement prepared by Marks, Pace described the

19

man who was farthest from him when they crossed paths as a "male black male

20

5'9"/5'10" medium weight, 25 years wearing blue jeans, a dark blue sleeveless vest

21

and a dark apple cap. He had a large (4"-5") wild afro." In contrast to this

22

description, at trial, Pace described this man as "a big guy, maybe six feet, six two,

23

about between 180 and 200 pounds…He was a big guy." (This man ran past Pace on

24

the other side of the street about thirty or forty feet away.)

25

45.   Marks later admitted to DDA Aalto that he "structured" his interview

26

with Pace such that Pace would not eliminate Terrell as a suspect. (Such a

27

"structuring" is consistent with Marks' having suggested the 5'9" physical

28

description that Pace later said at trial was incorrect.) During the interview, however, Pace nonetheless insisted that neither of the men he saw run past him was Frederick Terrell, whom he had known for over ten years, and who he said he would have recognized "anywhere and under any circumstances." Nonetheless, Marks characterized Pace's statement as an inability to identify the farthest man and proceeded to obtain an arrest warrant against Terrell without disclosing Pace's unequivocal denial that the person he saw was Terrell. DDA Aalto "found it troubling" that Marks had "attempted to manipulate the outcome of the [Pace] interview" and decided to interview Pace herself pretrial. During the interview with Aalto, Pace questioned why Marks "had it in for Terrell" and stated that Marks "pushed him hard" to identify Terrell.

46.   According to the Pace statement prepared by Marks, Pace described the other man he saw as a "male black 5'7/5'8 thin 30 years old wearing a black leather jacket, blue jeans and a dark apple cap. He had a mustache, appeared unshaven with a goatee." That statement also described that hat as "an English touring hat"; that the man in the leather jacket passed closest to Pace (maybe within three or four feet); and that the closest man was looking down at the time he ran by.  That statement also says that Pace stated that he thought he recognized this man as a guy he knew as "A.D."

47.   In fact, as Pace has made clear in his trial testimony and in post-trial statements, Pace told Marks a) that he had only known "A.D." for two or three months from the pool hall on Adams and Raymond Streets and that this man hung out with Frederick Terrell; b) that his choice of the A.D. photo was to identify the photo that most resembled the person he saw running by, not to identify him as in fact the person he saw; and c) that he "was not sure at all" that A.D. was the person he saw. Accordingly, Marks' description of what Pace told him was false and intentionally misleading.

48.   The signed Pace statement drafted by Marks asserted that he was only 80% sure that it was Wilson he saw that night. On information and belief, that 80% figure originated with Marks (who similarly described Bishop's subsequent identification of Wilson as 80% certain), and Marks consistently reinforced that Pace's identification of Wilson was correct in his interactions with Pace leading up to trial. (As is explained in § VIII (E), newly discovered evidence establishes that Pace likely saw the two men run by .3 miles from the scene prior to or at the time of the murder, eliminating them as suspects.)

49.   Pace had not known Wilson very long and had not seen him that often at the time of the incident. On cross-examination at trial, Pace was asked: "Q: You weren't sure at all that that person [he saw that night] was Andrew Wilson, were you? A: No." Post-trial Pace adamantly stated that in fact he never told Marks the person he saw was Wilson, but only that the only person he knew who looked like the composite sketch Marks had shown him was Wilson.

50.   Pace's description of the man he saw running by him (identified as looking like A.D.) was inconsistent with Bishop's description of the clothing the driver side "stabber" was wearing – a blue and burgundy button-down plaid shirt. DA Aalto specifically noted that Pace's description was "off from wit [Bishop]" Bishop was certain the "stabber" did *not* have a leather jacket on and he was not wearing a hat (both of which Pace described the person he saw wearing). Thus, unless one assumes the totally unrealistic and unsupported assumption that Wilson was able to and did change clothes after stabbing Hanson, the person who ran by Pace was not the person who stabbed Hanson.

51.   Marks interviewed Pace's companions, Donald Brim and Norval Gully, who were with Pace the night Hanson was killed. Marks showed Brim the composite sketches and the 16-photo spread line up labeled "B," which included Wilson and Terrell. Brim recognized Wilson's photo but did not identify him as one of the men he saw that night; he stated he did not clearly see the men. Gully also

could not identify anyone and similarly stated he did not clearly see the men that night.

### 3.   Marks Directs Bishop to Identify Wilson's Photo .

52.   On November 29, 1984, approximately six weeks after the Hanson murder, having obtained an uncorroborated and uncertain identification of Wilson from Pace as the person Pace saw run by him the night of the murder, Marks showed Bishop a 16-photo lineup labeled "B" that included photos of Wilson and Terrell. Marks constructed this photo line-up based on criteria other than whether the individuals depicted bore any resemblance to the physical description of the suspect previously provided by Bishop (which is the proper and long-established photospread and lineup procedure). Specifically, the photo line-up Marks showed Bishop included Wilson's photo, along with photos of Terrell, Pace, Sanders, and Marshaunt Jackson, among others, even though those gentlemen did not resemble the physical description given by Bishop of the driver's side assailant: Terrell fit the description of the suspect on the passenger side; Pace and Sanders were witnesses; and Bishop had already eliminated Jackson as a suspect.

53.   Marks testified at trial that, although he didn't tell Bishop anybody was under arrest at this point, "I think it's fair to say she realized these photos weren't randomly selected and put into this photo line." The photo spread utilized by Marks deviated substantially from accepted photographic identification procedures: it contained many photographs of people Bishop had already eliminated or seen before and not picked out; it did not include non-suspects fitting the general description of the assailant; and Wilson had distinctive physical characteristics that made him stand out.

54.   Bishop told Marks she recognized Pace and Jackson from the photo spread, but she did not recognize Wilson. She hesitated over the photo of Terrell, tentatively identifying him. On information and belief, Marks prodded her to identify Terrell but was unsuccessful at eliciting a clear identification from her.

13

1  Bishop eliminated several other photos, and then became stuck – unable to identify

2  Terrell's co-assailant – the driver's side "stabber."

3      55.   At that point, it is undisputed that, after Bishop failed to identify

4  Wilson's photo, Marks (according to his own written statements) "directed" (Marks'

5  words) Bishop's attention to Wilson's photo, after which she identified this photo as

6  the stabber with 80% certainty. It was only *after* Marks directed Bishop's attention

7  to Wilson's photo that she identified him for the first time as the assailant on the

8  driver's side of the vehicle, although she had previously seen his photograph in the

9  mug books she reviewed and although she knew him from her childhood.

10          **4.   Marks Submits Probable Cause Arrest Warrants for Wilson
               and Terrell Admitting He Directed Bishop's Identification of
11             Wilson And Wilson Is Arrested And Placed in A Live Line
12             Up.**

13     56.   On November 30, 1984, Marks submitted search and arrest warrants for

14  Wilson and Terrell to the Hon. Judge Nancy Brown. (The District Attorney's Office

15  was not involved in the warrant application.) In the affidavit authored by Marks in

16  support of the warrants, he admits:

> Affiant prepared a photo line-up containing 16 photo's [sic], to include those
17 of Wilson and Terrell. That line-up was shown to Witness Bishop who
18 hesitated over photo of Terrell, commenting over similarity with Suspect #2
    on her side of the vehicle. However, she indicated she couldn't be positive
19 absent a live line-up and the opportunity to hear him speak. She then
    eliminated several other photo's following which *your affiant directed her*
20 *attention to Wilson's photo* which she then identified with 80% confidence.
21

22  (Emphasis added.)

23     57.   As discussed below, this affidavit was tragically never provided to

24  Wilson's counsel for trial, and Wilson did not ultimately receive it until 2010 when

25  the Superior Court granted his discovery motion pursuant to PC §1054.9 while he

26  was in custody. This process both allowed Marks to mislead the jury at trial on the

27  key issue of Bishop's identification and to deprive the District Court of facts

28

1  necessary to grant Wilson's petition for a writ of habeas corpus in 1990 directly
2  causing its denial.

3       58.    After hearing that Marks was looking for him and that Marks wanted to
4  question him about a murder, Wilson called Marks. Wilson told Marks, "You know
5  I don't do stuff like that." He surrendered himself and asked for police to pick him
6  up on December 3, 1984. Wilson waived his right to speak with an attorney and told
7  Marks he knew nothing about the crime. There are no written statements or notes
8  from Marks' interview with Wilson. On information and belief, the lack of such
9  statements or notes is contrary to LAPD policy.

10       59.    After being confronted by Marks, Wilson was placed in a live line-up
11  before Bishop and was asked to speak certain lines. Contrary to her inability to
12  identify Wilson on multiple occasions shortly after the incident, Bishop identified
13  Wilson as the assailant on the driver's side. Bishop also claimed to recognize Wilson
14  from his voice because, she asserted, even though she was screaming from the
15  moment she was awakened by the robbers, she stopped screaming *at the moment* he
16  spoke the sentence she said she heard.

17       60.    Marks said that after the live line-up, as he was driving Bishop home,
18  she "muttered something out loud like a light had just come on, to the effect that she
19  had known him, she knew of him" in front of Marks. This was the first time Bishop
20  indicated to Marks that she knew Wilson and recognized him as having visited her
21  home in the past. This revelation is not noted anywhere in the murder book
22  chronology provided to the defense prior to trial.

23             **5.**    **Wilson (And Terrell) Are Charged With Murder.**

24       61.    Wilson was charged with one count of violating Penal Code §187
25  (murder) and one count of violating Penal Code § 245 (robbery). Frederick Terrell
26  was also charged with murder although the District Attorney dismissed those
27  charges pretrial.

28

15

62.     Wilson was initially represented by Los Angeles Deputy Public Defender Jim Barnes. In approximately December 1984, the Court appointed panel attorney Franklin Peters and his associate to represent Wilson, who represented Mr. Wilson through trial.

## VI.   TRIAL

63.     Wilson's trial began on October 21, 1986. The critical issue at trial was eyewitness identification, as there was no physical or other evidence against Wilson sufficient to support a guilty verdict beyond a reasonable doubt. The lynchpin of the prosecution's case was Saladena Bishop's identification of Wilson as the driver side assailant. In addition, the prosecution relied on the testimony of Clarence Pace and Vincent Sanders. Because Bishop's testimony was the key, it is summarized in detail.

### A.     SALADENA BISHOP TESTIMONY IDENTIFYING WILSON

64.     The key elements of Bishop's trial testimony identifying Wilson were:

a.  She and Chris Hanson were sleeping in the car, she on the passenger side, when she woke up to people threatening and demanding money or they would die. There was a man on the passenger side, with his head and upper body through the window and a man on the driver side. They took Hanson's wallet and ran north.

b.  She testified that the passenger side man was Frederick Terrell, and the driver side man was Andrew Wilson. Those names were given to her by Marks at the lineup. As we explain later, charges against Terrell were dropped, and he was not a Defendant at trial.

c.  She described the driver side man as brown skinned, unshaven, with long, bushy hair, about 5'5"-7"; he was wearing a gray sweatshirt with a plain button down, blue shirt; the sweatshirt was inside the plaid shirt.

65.    Bishop reviewed a lot of mug books; she gave information for drawing a composite sketch; she was later shown a photospread. On cross-examination, further information was elicited regarding her identification:

    a.    Bishop had reviewed mug books with Wilson's photo and did not identify him at the time.

    b.    On her first review of the mug books, Bishop picked out one person four times as the passenger side man, and the man was not Frederick Terrell, but she was now sure that Terrell was the person; she also picked about five or six other people from the mug books as the passenger side man none of whom were Terrell (or Wilson).

    c.    Bishop went on a ride-along with Detectives Marks and picked a man on a bench as the passenger side man; he was arrested (and she later eliminated him based on his voice).

    d.    After she picked Terrell from the photospread, Bishop picked someone else, but she didn't know who that was; she wasn't sure about Terrell until she thought about it.

66.    Bishop's description of the photospread was limited to the fact that Bishop talked about the photos of both Terrell (#2) and Wilson (#7) when reviewing the photospread; that she was about 70-80% sure on Wilson[1] and 40-50% sure on Terrell; and that she wanted to see a live lineup and hear certain words spoken ("Give me that money, man, or you gonna die" for Wilson and "Check it, man. Shut up, bitch, or you gonna die" for Terrell); and that everyone in both lineups (there were two) said "Check it."

---

[1] In contrast, Marks' description in his written statements was that Bishop was 80% certain, not 70-80%.

67.     She testified that she identified Wilson, who was #2 in one lineup, and no qualification was placed on that description. She also testified that she made two identifications that were not 100% from a second lineup (#'s 3 and 6). (The implication was therefore that her first identification was 100%). Her written identification said #2 is the man who murdered my boyfriend, and #6 resembles the man on her side.

68.     She further testified that, at the lineup, she recognized the driver side man's profile, his voice and his teeth, which had a gold cap (except that night, it looked like a missing tooth or something, or a different coloration). Wilson was then instructed to show his gold cap to the jury. Bishop said she did not know if Wilson had the gold tooth when she knew him. Notably, there is no indication in any police report or document that Bishop ever identified the person she saw as having a gold tooth, and Bishop testified that she never told the police that the driver's side assailant had a gold tooth. On information and belief, at some point prior to trial, Bishop was advised or learned that her failure to say that the assailant had a gold tooth undermined her identification and she needed to explain it. In fact, had the assailant had a gold tooth, that would have been his most prominent feature. Bishop's failure to have identified the assailant as having a gold tooth alone substantially undermines her identification.

69.     Bishop did not tell the police that she knew Wilson or that she only saw part of his face (above the hairline) in right side profile. She agreed she only saw his face for a few seconds after awakening from a deep sleep; when she woke up, she was facing the passenger side and she got the best look at the man on that side but was only 40-50% certain of her ID of the passenger assailant.

70.     She also testified on cross that it was dark when she woke up, that she started screaming when she saw Terrell, and she was screaming and pretty hysterical

when she turned to the driver's door; she stopped screaming when she heard the murderer talk.

71.    She further testified on cross that Wilson was the only person in the live lineup with a gold tooth, and she knew he was going to be in the live lineup because she had picked him out and had asked for him to be placed there. Wilson was the only one in the live lineup whose picture she had seen before. She agreed that it was easy to pick someone whose picture you've seen before.

72.    According to Bishop, she first realized that she had seen Wilson before at the live lineup. She would see him around where she used to live about three years before the murder. She hadn't seen him for three years. Wilson was her cousin's friend; she found out after the lineup from the detective that they were married. She had seen him at her house when she was 14.

a.    In contrast, Bishop's preliminary hearing testimony was that she knew Andy the night of the murder, saw his photo in the mug books and went past it. (This, of course, means that, despite recognizing Wilson in the photos, she never said that photo was a picture of the driver side assailant or even resembled the driver side assailant.)

73.    On cross-examination, Bishop said she knew Wilson's wife quite well and had seen her at her house a lot, including with her daughter, but denied babysitting the daughter or that Wilson paid her to do so. Bishop agreed that her sister, Dedra, knew Wilson; her cousin, Ron Johnson, knew Wilson; and her aunt, Georgia Johnson, knew Wilson; but she did not think her brothers, Jahana and Michael, knew Wilson.[2]

_____

[2] The prosecution also presented testimony from Bishop claiming that Wilson called her, first "pretending to be a DA…saying that Andrew was innocent" and that Wilson later identified himself and asked "please don't press charges, because I didn't do it." (No corroboration of this call was ever provided as there was no record from the jail, where

1

### B.   CLARENCE PACE TESTIMONY

2    74.    Pace did not testify at the preliminary hearing.  Between the

3 preliminary hearing and the trial, Marks would have Pace picked up and taken to the

4 Hall of Justice and detained.  Pace was never arrested or charged with anything.

5 During these meetings, Pace was placed at a table and Marks came into the room

6 and stared at him without saying anything.  Marks would put his foot on top of

7 Pace's under the table and hold it there pushing down on his foot.  Pace felt that he

8 was being pressured to testify against Wilson and Terrell.   By the time he got to

9 trial, Marks had conveyed to Pace that he could make things rough for him if he

10 didn't come forward and say "the right things" in the case against Wilson.

11    75.    At trial, Pace testified that he was walking north on La Salle the night

12 of the murder and saw two people turn onto La Salle from 22nd St. and go (between

13 a jog and a run) south; whey they hit 23rd, they started to run faster. He somewhat

14 knew Wilson by the name "A.D."

15    76.    The man he later identified as A.D. was wearing jeans, dark colored

16 trousers, a leather jacket, and a cap (later described as an apple cap or an English

17 touring cap). The jacket was a hooded jacket, which may have had underneath a

18 sweat shirt or sweat top. He did not remember the color of the sweat shirt.  This man

19 had his head down as he ran past him.

20    77.    Although Pace testified at trial that he was 80% sure that the person he

21 saw running by him was Wilson, he clarified that testimony, explaining that he was

22 not certain at all of his identification, he had not known Wilson for very long, the

23 people ran by quickly, and he saw them for a few seconds.  (See also Section VIII

24 (E), describing newly discovered evidence establishing that Pace likely saw the two

25

26 ─────────────────────

(…continued)

27 Wilson was being held.)  On information and belief, at this time the LASD routinely recorded phone calls made by inmates in the County jail where Mr. Wilson was housed.

28

20

1   men run by .3 miles from the scene prior to or at the time of the murder, eliminating
2   them as suspects.)

3       78.    The second person was not Frederick Terrell, whom he knew well and
4   had known for a long time and would have recognized.

5       79.    He did not initially mention anything about the person wearing a
6   hooded sweatshirt and did not know when he first said that.

7       **C.    VINCENT SANDERS RECORDED STATEMENT AND TESTIMONY**

8       80.    In the early morning on December 2, 1984, Marks executed an arrest
9   and search warrant on Terrell, who was arrested and booked. Terrell's cousin,
10  Vincent Sanders, watched from his front porch across the street.  Marks confronted
11  Sanders about Terrell's whereabouts and threatened him. According to the murder
12  book, at 9:30 a.m., Vincent Sanders (who was himself on parole for robbery)
13  contacted Marks to inform him that he had information on a "new" suspect – not
14  Terrell. Marks stated Sanders came to the police station and provided a recorded
15  statement to him indicating that his cousin Terrell was *not* involved in Hanson's
16  murder, but instead that he had overheard Wilson and a man named Ricky Wilson
17  talking about having committed the crime.

18      81.   Based on Sanders' information, on December 3, 1984, a photo line-up
19  labeled "C" was created, which included a photo of Ricky Wilson. The "C" photo
20  line-up was shown to Pace and Bishop, who were unable to identify anyone in it.
21  Marks did not question Sanders regarding whether he himself was involved in the
22  crime, nor were Bishop and Pace shown photos of Sanders or asked to identify him.

23      82.   Despite claiming to know detailed information about the crime, Marks
24  apparently never questioned Sanders if he himself was involved.  Marks also never
25  questioned Sanders if the source of his detailed information was from a previous
26  Los Angeles Times article about the Hanson murder.  Regarding Sanders'
27  credibility, DA Aalto later wrote in her notes "would you use Sanders at all?"

28

83.   Sanders refused to appear at the preliminary hearing in response to a subpoena and, as a result, was rearrested for violating parole. When forced to appear, Sanders stated he did not remember anything about his prior statement because he was "on drugs" and that when he smokes cocaine he hears things and hallucinates. Marks took the stand and read the signed statement Sanders allegedly gave him (that he overheard Andy Wilson and Ricky Wilson discuss having committed the murder) into the record.

84.   At trial, Sanders told the jury: "I don't know nothing about the crime," "Everything I had said, [Marks] made me say it…[by threatening] to put me in jail," and calling me a "piece of shit" and calling Sanders' mother the same. He further testified that "[w]hen Marks used to see [him] walking down the street he used to threaten [him] and shit." Sanders further denied that he called Marks and volunteered to give a statement. He testified that he lied because Marks made him lie and explained:

> The statement I made to Detective Marks, he the one really put the statements in words down there, okay?...the second reason I made a statement is because he threatened me about my family, what he would do to my mother, and I'm only child, right?...he said if I didn't say this and say that, how he would "f" me up with my parole and send me back to the pen, this and that.

85.   In a prior taped interview played for the jury, Sanders told Marks that he had overhead Wilson bragging about committing the crime with Ricky Wilson. That taped interview was played for the jury after Sanders testified that he lied on the tape and was coerced into doing so by Detective Marks. (Plaintiff contends that Sanders lied on the tape. It is undisputed that the tape does not represent the whole conversation between Sanders and Marks because the tape refers to previous unrecorded conversations. Ricky Wilson's photo was shown to both Bishop and Pace, neither of whom identified him, or even indicated a resemblance to anyone they saw; by definition, Sanders' statement was untrue if Ricky Wilson was not involved in the murder, which all available evidence says he was not.)

1   86.   While Marks denied any prior contact with Sanders, Sanders testified

2   that Frederick Terrell was his cousin. (As previously explained, Marks agreed that

3   he had structured the Bishop identification to keep Terrell in the case and the

4   District Attorney's Office ultimately dismissed the Terrell charges.) Sanders

5   testified that Marks had tried in the past to get him to say things about Terrell; that

6   Marks threatened to do things to him and his family; that what he said at the

7   interview were Marks' words; that he never heard Wilson say anything about a

8   murder; that he would take a lie detector test; and that he testified at the preliminary

9   hearing that he was high on drugs.

10   **D.   VERDICT**

11   87.   The jury deliberated for three days. On November 12, 1986, the jury

12   returned verdicts finding Wilson guilty of first-degree murder and robbery, and

13   finding a special circumstance weapon allegation. At proceedings conducted on

14   February 6, 1987, the court denied Wilson's motion for new trial and sentenced him

15   to life without the possibility of parole plus one year.

16   **VII.   SUBSTANTIAL EVIDENCE WAS WITHHELD, FALSIFIED AND/OR**
17   **CONSTITUTIONALLY TAINTED AND IMPROPER**

18   **A.   MARKS INTENTIONALLY POINTED WILSON OUT TO BISHOP AFTER**
    **SHE FAILED TO IDENTIFY HIM, AND EFFECTIVELY CONCEALED THAT**
19   **INFORMATION FROM DEFENSE COUNSEL IN HIS CASE NARRATIVES.**

20   88.   The search and arrest warrants obtained by Detective Marks and

21   referenced previously (see § IV(C)(4)) were what are known as Ramey Search

22   warrants, in which law enforcement presents directly to a judge the warrant

23   application and supporting documents and obtains a warrant. The District Attorney's

24   Office is not directly involved, and, if there is ultimately a criminal charge filed

25   against the subject of the warrant, that case receives a different California Superior

26   Court number, and the warrant and related materials are not contained in the later

27   filed criminal case court file.

28

23

89.     In his search warrant affidavit, Marks described Bishop's identification of Wilson in language that admits that he engaged in a constitutionally impermissible suggestive eyewitness identification of Wilson by Bishop, as a result of which  she made an identification (albeit only a tentative one at that time):

> "Affiant prepared a photo line - up containing 16 photo's, to include those of Wilson and Terrell. That line-up was shown to Witness Bishop who hesitated over photo of Terrell, commenting over similarity with Suspect #2 on her side of the vehicle. However, she indicated she couldn't be positive absent a live line – up and the opportunity to hear him speak. *She then eliminated several other photo's following which your affiant **directed** her attention to Wilson's photo which she then identified with 80% confidence*. Again she indicated her desire for live line-up, profile view, and voice."

(Emphasis supplied.)

90.     While Detective Marks wrote in his November 30th warrant affidavit that he directed Bishop's attention to Mr. Wilson after Bishop reviewed the photospread and made no identification, neither the police report nor the Chronological Record (hereafter "Chron") maintained by Det. Marks referred to his directing Bishop's attention to Wilson.

91.     The Chron had numerous original entries that were dated. These were in black. There were added entries to the Chron noted in red as such but without an indication of the date that it was added. (The date of the event is included but not the date that Marks inserted it into the Chron.) The original entries in the Chron refer to the presentation of a Ramey Warrant affidavit without any description of its contents or to the Bishop identification. There is a later entry in the Chron that begins with the word "Omitted" and is dated Nov. 29; the entry is in red (a different color from that of the original Murder Book). That omitted entry indicated that Bishop made an 80% identification of Wilson (and a 40% identification of Terrell) and would prefer a live line-up and to hear the voices:

> "11-29. 12:00. Saladena Bishop (victim's girlfriend) came to sta at Det's request to view photo line-up 'B' – 80% ID on 'AD [referring to Wilson] as

24

susp/1. And 40% on Frederick Terrell as susp/2. Would prefer a live line-up and to hear the voices."

92.  Notably, despite specifically adding that information to the Chron, no reference was made in even this added entry in the Chron to Marks' affidavit or to his directing Bishop to the Wilson photo after she failed to make an identification. Thus, one would have no information that Marks engaged in such directing activity from reviewing that entry, and the same is true for other Chron entries and for all the documents that appear to perform the role of an arrest report.

93.  There is a November 30th Chron entry (not in red and without the word "omitted") referencing Marks' affidavit, but again without referring to his conduct directing Bishop to Wilson: "11/30 14:00 Presented Affidavit for Ramey Warrants for Wilson Terrell to Judge N. Brown Div. 30 – included request for search warrant for Terrell's residence at 1846 W. 25th St."

94.  There is also a December 4th Chron entry describing that Bishop identified Wilson but again with no reference to her failing to identify him and Marks directing her to him:

"12/4 1230 "P/u Saladana Bishop at her reside and trans. LACO Jail for lineup. IDs Wison as Susp/1 and then split btwn Terrell and another indiv in the lines as susp/2 [in red says P*56598]

"Note: Wit viewed lineup #1 and ID susp #2 (Wilson) as the man who murdered her boyfriend. After viewing Line#2 she ID'd susp #3 (Terrell) as resembling the man on her side of veh. However she asked for the first lineup sheet back and annotated it with a reference to susp #6. When asked to clarify the reference to Susp #6 (in the presence of D/PD representative), the wit stated that susp #6 from Line #1 and susp #3 from Line #2 both resembled the man on her side of the veh on the night of the murder."

95.  Similarly, the relevant portion of the December 5th arrest report provides nothing about Bishop even making an 80% ID (but does re: Pace). The December 5, 1984 arrest report) says, in relevant part:

Suspects approached victim who was s seated in parked vehicle on residential street with his girlfriend. Suspects brandished knives, demanded money and fatally stab victim, taking his wallet.

Follow up investigation identified defendants and Ramey Warrants obtained

Subsequent to their arrest, defendants were placed in separate live lineups on December 4, 1984, Witness Bishop (Victim's girlfriend) identified Defendant Wilson as Suspect #1 and noted that both Terrell and another individual in the line ups resembled suspect #2.

96.   The same holds true for the other arrest report type document in the Murder Book, again describing identifications and the Ramey warrant without pointing out that Marks directed Bishop to Wilson after she failed to identify him:

Pace's physical description was consistent with that provided by Witness Bishop. Pace also indicated he was 80 percent sure that Suspect #1 (closest to him) was a person known to him only as "A.D." Pace was showing the Southwest Area Robbery Mug Books and he identified booking # 7788415 (Andrew Wilson) as "A.D." In addition, he identified a second booking photo (#7788414) as that of "Fast Freddie" (Frederick Terrell), a frequent companion of "A.D."

Pace was unable, however, to identify Fast Freddie as the other Male, Black he'd seen running. Investigating officers noted that both Wilson and Terrell bore a strong resemblance to the composite of the suspects that was drawn with Witness Bishop's assistance. Both suspects' photos were placed in a photo line-up display, with 14 additional photos, and showed it to Witness Bishop. Witness Bishop tentatively identified the photos of Terrell and Wilson as the suspects that killed Victim Hanson. Witness stated to be sure she would have to see the suspect's in person and hear their voices.

On November 30, 1984, detectives completed Ramey Warrants for Suspects Terrell and Wilson along with a Search Warrant for Terrell's residence, 1864 West 23rd Street.

On November 30, 1984, Judge Nancy Brown, Division 41, Los Angeles Municipal Court, signed both Probable Cause Warrants and the Search Warrants.

97.  The foregoing reports as well as the foregoing Chron entries were intended to, and did, give the false and misleading impression that all the relevant information regarding the identifications could be found there when in fact that was not true. This misleading false impression was not accidental. Marks stated during an interview in connection with the habeas investigation that he realized it was an issue. On information and belief, once Marks realized it had to be recorded somewhere, he intentionally buried it in a document that was not a part of the normal case file where there was the least likelihood it would be noticed, in violation of his obligation to include all exculpatory information in a manner in which it was likely to be seen and noticed by the prosecution and the defense. In doing so, Marks both violated this Brady obligation to disclose exculpatory evidence and affirmatively misled the prosecution and defense in presenting numerous descriptions in reports of Bishop's identification without referring to his directing Bishop to Wilson after she failed to identify him.

98.  Detective Marks claimed in notations in the Chron that defense counsel Jim Barnes went to the police station on December 17, 1984, "reviewed [the] murder book" and then "ID'd items for disov[ery[ which were photocopied and provided." Marks now maintains that Barnes did not request the whole murder books but only certain, specified documents, from it. By implication at least, Marks maintains that the murder book he showed to Barnes contains his search warrant affidavit, and that, if Barnes did not have it, it was because he did not ID it. Marks further now maintains that Barnes brought with him a portable photocopier and made copies of the selected Murder Book materials.

99.  These contentions are false. More specifically, it is false that the defense or any defense counsel ever received a copy of the Marks affidavit in support of the Ramey warrant or was aware that Marks directed Bishop specifically to Wilson after

1  she reviewed the photos and did not pick Wilson out. Numerous facts make this
2  clear:

    a.  While defense counsel Barnes does not specifically recall this case, his habit and custom was not to visit police stations and, more importantly, was to request copies of everything, including the complete Murder Book.

    b.  Neither Mr. Barnes, nor the Public Defender's Office when he worked there, had or had use of portable copiers.

    c.  The sole reference to the Marks affidavit in the Chron is to the preparation of an affidavit for the Ramey warrants. It does not provide the affidavit's contents, and specifically does not say anything about Marks directing Bishop to Wilson.

    d.  There was no contemporaneous recording in the Chron regarding Bishop's identification.

    e.  Mr. Barnes represented Mr. Wilson at the preliminary hearing (not at the trial) and, despite extensively covering the topic of Bishop's identification, never posed any questions suggesting that Marks directed Bishop to Wilson after she had failed to identify him as having been involved in the murder. Nor was the affidavit marked as an exhibit at either the preliminary hearing (or, for that matter, at the trial). Mr. Barnes was an experienced criminal defense lawyer, and it is inconceivable that such basic questioning would not have been pursued had he been aware of it.

    f.  Trial defense counsel, Franklin Peters, is deceased and so he is not available to testify. However, he also was an experienced criminal defense lawyer, and his cross-examination never referred to that affidavit or to Marks directing Bishop to Wilson. Had either Barnes

or Peters known of the affidavit and Marks directing Bishop to Wilson, both, as experienced defense counsel, would have used that information to undermine Bishop's identification.  Both defense attorneys Barnes and Peters were unable to cross-examine Bishop about Marks directing her to identify Wilson *during the photo line-up procedure itself,* because neither was ever informed of that fact.

g.  The fact that the defense was never aware of the Marks affidavit's contents or that Marks directed Bishop to Wilson is further demonstrated by the fact that Wilson's counsel never moved to suppress her identification based on that fact, no jury instruction was proposed regarding how to view testimony in such circumstances, and no argument was made to the jury based on Marks' pointing Wilson out. Any reasonable, experienced defense counsel who knew of the contents of Marks' Ramey Warrant affidavit would have done all of these things. Unless one assumes the extraordinary scenario that two experienced criminal defense lawyers both committed malpractice on the most important issue at trial by not challenging Marks' admitted coaching of Bishop to identify Wilson, they could not have known that Marks directed Bishop to Wilson as a prelude to her identifying him.

h.  No evidence indicates that Trial DA Aalto was specifically aware that Bishop failed to identify Wilson from the photospread and only did so after Marks directed her to him. Although she asked Marks at trial, "Now, you indicated that photograph in position 7 [Wilson] to Saladena bishop, is that right?", to which he responded, "At some point, yes, I did." that question does not indicate awareness of the Marks language in the affidavit because 1) it uses the word

"indicate" and not "directed" as the affidavit does, and 2) the response "at some point" was clearly and intentionally misleading (allowing the implication that it was after Bishop's identification). Unless Aalto was intentionally evading her *Brady* obligations – a contention Plaintiffs do not make and for which there is no support in information known or available to Plaintiffs – she was unaware of the affidavit's contents, and Marks never affirmatively called it to her attention. In a post-trial interview, DDA Aalto stated that before trial she was not aware that Marks "directed" Bishop's attention to Wilson's photo and if she had known it would have been "very troubling" to her.

i.   Indeed, it is likely that, had Aalto known this information, she would have directed that charges be dropped against Wilson as she did for the charges against Terrell (which Marks has admitted he "structured" in order to keep Terrell in the case).

j.   Leaving aside the warrant affidavit itself, there is no reference to Marks directing Bishop to Wilson in any investigative report, pre-trial hearing, or preliminary hearing in the Wilson investigation or criminal proceedings.

k.   On May 7, 1990, Wilson filed a pro se petition for a writ of habeas corpus in the United States District Court, in which Wilson emphasized Marks' trial testimony that he indicated Wilson's photo to Bishop "at some point." Wilson did not have (and therefore could not submit to the court) the Marks' affidavit admitting that Marks directed Bishop to Wilson before she identified him. Then Magistrate Judge George King's Report and Recommendation (adopted by the District Court) concluded that there was "no

indication [in the record] as to <u>when</u> in the proceedings he ["the detective who showed the photos to Bishop"] did so. Consequently, we cannot agree with petitioner that Bishop chose the photo of him <u>because</u> the detective had already pointed him out to her." (Emphasis in original.) The District Attorney's Office never called the Court's attention to the Marks affidavit and never corrected the Magistrate Judge's Report and Recommendation regarding whether Marks' activity indicating Wilson occurred before Bishop ever identified him.

l.  This conclusion by Judge King demonstrates that the materials provided to Mr. Wilson and his counsel, including those previously provided by either the LAPD or the District Attorney's Office, did not include Detective Marks' search affidavit dated November 30th stating that he had directed Ms. Bishop to Mr. Wilson's photo. Had that affidavit been in any of those materials, 1) they would have been submitted in support of the habeas petition; 2) Judge King would not have concluded that it was unknown "when in the proceedings" that identification occurred; 3) Judge King instead would have concluded that Detective Marks directed Bishop prior to her ever having identified Wilson in any manner; and 4) the habeas petition would have been granted and Wilson would have been released fifteen or more years earlier.

m.  The conclusion that the District Attorney's Office did not have a copy of the Marks' affidavit in its Andrew Wilson file is reinforced by the fact that neither the arrest warrant nor the Marks affidavit was in the documents produced to Mr. Wilson's habeas counsel by the District Attorney's office pursuant to the OSC in the habeas

proceeding, nor did the Index of documents produced to by the District Attorney's Office, dated December 6, 2016, indicate that the Murder Book was in the file and was withheld from production.

100.   The conduct in which Marks engaged in the Wilson case – directing witnesses and burying that conduct in documents with a substantial likelihood it would go unnoticed, and failing to correct witness testimony falsely describing their identification of a suspect – was a custom, habit and ongoing pattern and practice in which Marks engaged throughout this career.

**B.    MARKS FAILED TO CORRECT FALSE AND MISLEADING TESTIMONY BY BISHOP.**

101.   Marks was present throughout the trial and the preliminary hearing.

102.   Bishop testified at trial that, upon reviewing the photospread, she "talk[ed] about two different photographs" in it, Terrell and Wilson, who were #s 2 and 7 respectively [R.T. 920/6-921/11], after which the following exchange occurred:

> "Now, when you saw these photographs, were you a hundred percent sure when you saw them. A. No. Q. Do you remember how sure you were or not. A. I was about 70 or 80 on Wilson and forty – 40 or 50 on Terrell." [R.T. 921/12-17]

103.   The foregoing testimony was false and misleading. It gave the affirmative false impression that, upon viewing the photographs, Bishop identified both Wilson and Terrell unhesitatingly and without any material intervening activity or prompting of any kind. In fact, Bishop made no identification of a driver side person from the photospread until Det. Marks "directed" her to Wilson.

104.   The preliminary hearing was held on March 14th and 15th, 1985. Bishop testified. When Bishop was asked during the preliminary hearing if she had any trouble picking out a photo of Wilson, she falsely responded "no."

a.    Marks was present during this testimony, knew it was false as he had to "direct" Bishop's attention to Wilson's photo during the identification, but

failed to correct it in anyway. It was his obligation to call to the attention of the prosecutor that this testimony was false, and he failed to do so. (Had he done so, the prosecutor would have been obligated to immediately provide that information to defense counsel, and the issue would have been explored at both the preliminary hearing and at trial.)

C.   **THE WILSON DEFENSE WAS UNAWARE OF MARKS STRUCTURING OF THE TERRELL IDENTIFICATIONS AND FALSE STATEMENTS WERE MADE REGARDING THOSE IDENTIFICATIONS IN REPORTS**

105.   In addition to being unaware that Marks directed Bishop to Wilson's photo, the defense was also unaware that Marks had "structured" the identification of Terrell as having been the other person who participated in the murder.

a.   Marks himself described his conduct in obtaining identifications of Terrell as the second participant as having "structured" the interview in order to keep Terrell in the case.

b.   At some point, Marks admitted to DDA Aalto that he "structured" his interview with Pace such that Pace would not eliminate Terrell as a suspect.

c.   Bishop testified during the preliminary hearing that she picked out a "good five" photos of other suspects before she picked out Terrell.   Unlike the day of the live line-up – she was uncertain of her identification of Terrell – by the time of the preliminary hearing Bishop had "*no doubt at all*" in her mind that Terrell was the person she saw. At trial, Bishop explained that she was not certain about Terrell after the line-up but became positive about him, "later when [she] thought about it…real hard." By this time, charges against Terrell had been dropped because of the unreliability of Bishop's identification, a fact never known to the jury even though Bishop testified throughout the trial of her certainty that the passenger side assailant was Terrell,

d.  Unlike the Marks affidavit for the Ramey warrant, of which DDA Aalto was unaware, she was aware that Marks had "structured" the Terrell identification. As a result, she dismissed the case against Terrell (but did not advise defense counsel of that structuring by Marks).

e.  On June 20, 1986, a pre-trial hearing was held in front of Hon. Nancy Brown (the same judge who issued the search and arrest warrants for Wilson and Terrell) on Terrell's motion to suppress Bishop's identification of him as unreliable. This motion was brought only by Terrell. Wilson and his attorney(s) did not appear. Judge Brown indicated at the hearing that she reviewed the warrant and the affidavit authored by Marks (which includes the admission that he "directed" Bishop's attention to Wilson). Presumably at this time, Wilson's trial DDA Aalto was aware of the affidavit, but consistent with her statement during Wilson's habeas proceedings in November 2016, there is no evidence that she had it in the DA file or reviewed it. The Terrell motion did not raise, and nothing at the hearing referenced, Marks directing Bishop to Wilson.

f.  On June 23, 1986, DDA Laura Aalto authored a "Disposition Report" recommending that the case against Frederick Terrell be dismissed for insufficient evidence. In the report, Aalto notes that Pace told Marks "that he didn't think the other male was Terrell." Marks informed her, however, that "he structured the interview [with Pace] so the witness would <u>not</u> eliminate Terrell." (Emphasis added.) When Aalto asked Pace about the identification of Terrell, he stated "adamantly and unequivocally" the second person was not Terrell and asked why Marks "had it in for Terrell?" The case against Terrell was subsequently dismissed before trial despite the fact Bishop had identified him as the person on the passenger side of Hanson's truck.

106.     The arrest reports for both Terrell and Wilson state, "Pace was unable, however, to identify Fast Freddie (Frederick Terrell) as the other Male, Black he'd seen running. Investigating officers noted that both Wilson and Terrell bore a strong resemblance to the composite of the suspects that was drawn with Witness Bishop's assistance." That statement was false and, on information and belief, was formulated that way as part of an effort to keep Terrell as a suspect. In contrast to Marks' characterization that Pace was unable to identify Terrell, Pace affirmatively and adamantly denied that the other Black male was Terrell whom (unlike Wilson) he knew well and had known for a long time.

107.     Pace stated at one point that he could identify Wilson as the person running by him at 80% confidence level. On information, the 80% figure was provided by Marks.

**D.     ADDITIONAL EVIDENCE INDICATES THAT MARKS VIOLATED WILSON'S RIGHTS AND/OR DID NOT DISCLOSE IMPORTANT EVIDENCE**

**1.     Marks Arranged To Provide Bishop $1,000**

108.     On July 8, 1985, citing three phone calls Bishop received seven months earlier on December 5, 1984, Marks submitted a confidential "Witness Protection Assistance Request" for funds for Bishop in the amount of $1,000 to cover a period of six months, which neither prosecutor Aalto nor the Wilson defense had any knowledge of prior to trial. This was an internal LAPD document never disclosed until the habeas proceedings in 2016.

109.     The request states that Marks is "unsure" as to Bishop's willingness to testify without being provided assistance and states that she is the "only" eyewitness to the murder of her boyfriend. The request further states that Bishop's relatives, with whom she was living, subjected her to "verbal attack on her identification and cooperation in the investigation," because they had been mutual friends with Wilson and his wife.

110.   Marks received a check for $1,000 the following day, on July 9, 1985.

111.   The request and receipt of funds for Bishop occurred on July 1985, after Wilson's counsel requested and received discovery from Marks earlier in the year. There is no record indicating that these documents relating to payments to Bishop or her reluctance to testify without receiving payment were provided by Marks in a supplemental disclosure or was otherwise disclosed to the defense (or the prosecution) prior to trial, and there was no cross-examination on these issues at either the preliminary hearing or trial. To the best of DDA Aalto's recollection, she was unaware of payments being made to Bishop. (Although notes in Aalto's handwriting reflect that at some point she was made aware that Bishop was "evicted from wit[ness] protection placement" prior to Wilson's trial, those notes do not reference payment of funds.) The defense was also not advised of Bishop's placement in the witness protection program or of Bishop's potential unwillingness to testify if she did not receive money.

### 2. Marks' Partner Detective Bunch Did Not Believe Bishop, A Fact Not Revealed to the Defense At Any Time And Not Revealed To The Prosecution Until After Trial.

112.   DDA Aalto learned from Marks only after the trial that Marks' partner on the Wilson / Terrell case, Detective Bunch, did not believe in the Wilson prosecution because he never believed in Bishop's identification of Wilson.  Marks never disclosed Detective Bunch's opinion to either the prosecution or the defense prior to trial, and the defense was unaware of this information. Had it been known to Mr. Wilson or his counsel, defense counsel could and would have either interviewed or called Detective Bunch to testify.

113.   This knowledge would have provided the defense with important testimony. Had the defense known that Detective Bunch, the senior detective on the case, did not consider Bishop credible, they could have called him to testify as to what discussions he had observed that led him to that conclusion. (Even if a court

were to find that his conclusion was not admissible, the underlying facts that led him to that conclusion would have been.)

### 3. Marks Withheld That He Routinely Directed Witnesses To Suspects When The Witness Did Not Identify The Desired Suspect.

114.    It was not disclosed to members of the District Attorney's Office or to the Wilson defense that Marks' conduct of directing Bishop to Wilson was part of his regular practice throughout his career of directing a witness's attention to a specific photo in a line-up, nor was it disclosed that Marks knew that such conduct was outside LAPD's training.

115.    Had such information been disclosed, the defense could have called present and former LAPD personnel to explain that such procedures were discredited, produced unreliable results and were contrary to any eyewitness identification training LAPD did.

### E.   DDA AALTO WITHHELD ADDITIONAL EXCULPATORY EVIDENCE OF WHICH SHE WAS AWARE.

#### 1.   Bishop Previously Attacked Hanson with a Knife

116.    Notes in the District Attorney file show that Earl Martin, Christopher Hanson's best friend, contacted DDA Aalto pre-trial and reported a number of highly exculpatory pieces of information to her. In an interview with DA Aalto, Bishop corroborated that she was living in a house with a friend (Earl Martin) and his girlfriend (Natalie Williams).  None of the following pieces of information favorable to the defense was disclosed to the defense:

- Bishop had previously attacked Hanson;
- Bishop had previously attacked Hanson with a knife, possibly while on PCP;
- Bishop lunged at Hanson which caused Hanson to hurt his knee. This was 1.5 weeks before Hanson's murder and the reason he was wearing a knee brace at the time of his death;

- Martin previously asked Hanson, "what do you do if she attacks you w/ knife again?"
- Bishop got in a fight with Martin's girlfriend – Natalie Williams – and hit her in the face;
- Martin felt Bishop "was involved in it, or she actually did it [Hanson's murder]";
- Martin requested to view the murder weapon because he had a box of tools in his house and had noticed a missing knife.

117.   None of the impeachment evidence regarding Bishop's false police report and willingness to lie to police was provided to the defense prior to trial. DDA Aalto stated she would have asked Marks to conduct any investigation into the Martin allegations.

**2.   LAPD Detective Purington Determined Bishop was "a Liar" based on a False Police Report She Made Accusing a Man of Kidnapping and Assaulting Her a Few Months <u>Before</u> the Prosecution Called Her as its Key Witness Against Wilson.**

118.   In August 1986, just a few months before the Wilson trial in October 1986, DDA Aalto was informed that Bishop filed a police report alleging a man named Leroy Horne kidnapped and attempted to rape her, but that LAPD investigating her claim declined to prosecute the case because the investigator, Detective Tom Purington, "says she's a liar." DDA Aalto stated in her notes "I believe he's right in his judgment re his case."

119.   According to the police report from the Horne case, Bishop told police she was waiting at a bus stop when Horne stopped his car, opened the passenger door, and, using a simulated handgun stated, "Get in the car Bitch, I've got a gun." This statement Bishop attributed (apparently falsely) to Horne is similar to what Bishop told officers the assailants said the night of the Hanson murder – "Shut up Bitch or you'll die." According to Horne's account, which law enforcement found

credible, Bishop willingly entered Horne's car and at one point "got angry and broke the key off in the car ignition." After the police were called, Bishop "immediately came out screaming, yelling, and completely out of control."

120.    When interviewed post-trial, Aalto stated she would not have provided any information about Bishop's false report and Purington's conclusion that she was a liar because, in her opinion, Bishop "never had any credibility anyway."

121.    Neither the LAPD nor the Los Angeles County District Attorney's Office had any system in place to track or identify known false witness statements or other known facts that would make them unsuitable as witnesses in other cases or would be exculpatory evidence undermining their credibility if they were used.

F.    OTHER DISCLOSED EVIDENCE FURTHER UNDERMINED BISHOP'S CREDIBILITY

1.    Bishop Recognized Wilson From Her Earlier Encounters With Him But Only told Marks After He Directed Her To Wilson's Photo

122.    Bishop's credibility and the reliability of her identification were further undermined based on her prior knowledge of Wilson. Bishop testified at preliminary hearing that she knew Wilson as "someone a member of her family knew" and that she had known him "a while – [she] used to see him off and on," several years earlier. She said she had seen him at her house only one time. She stated: "I knew who he was the night my boyfriend was killed and they showed me a book of pictures. I seen his picture. I recognized him. I just went across."

123.    However, even though Bishop recalled recognizing Wilson in the mug books the night Hanson was killed, she did not say anything about knowing him until six weeks later, after she made her identification at the live line-up. Bishop looked at mug books and picked out photos of several others but still did not identify Wilson. She looked at him in the photospread and did not pick him until directed by Marks. The phenomenon of previous exposure to a person resulting in unconscious transference, in which a person seen in one situation is mistakenly

1  associated with another, is well-recognized in the literature on eyewitness

2  identification.

3  ## 2. Bishop's Testimony Regarding Wilson's Gold Tooth

4  124.  When Bishop was asked at the preliminary hearing whether she

5  recalled anything unusual about the mouth of the driver's side attacker, she stated

6  *for the first time* since she began describing the assailant that it "looked like he had a

7  missing tooth…there was something about his mouth." The fact that she recalled

8  such a critical identifying feature for the first time at the preliminary hearing

9  indicates that she was given "help" recalling anything about Wilson's tooth.

10  125.  Although Bishop testified at the preliminary hearing that she noticed

11  Wilson's tooth at the time of the murder, no police report mentions his tooth, Marks'

12  affidavit does not mention the tooth, and Marks' chronology does not mention the

13  tooth. On information and belief, Marks and/or the prosecutor realized before trial

14  that the omission of any mention of such a distinctive facial characteristic

15  substantially undermined Bishop's identification and prepared her to respond that

16  she had noticed it at the time of the murder. It was never disclosed to the defense

17  that Bishop's first mention of Wilson's tooth came from questioning by Marks

18  and/or the prosecution and was not initiated by Bishop.

19  # VIII.  POST-CONVICTION PROCEEDINGS.

20  ## A.  LETTERS AND DIRECT APPEALS

21  126.  Wilson filed a direct appeal and the California Court of Appeal

22  affirmed his conviction and sentence on June 22, 1988.

23  127.  On numerous occasions throughout his incarceration, Wilson, primarily

24  though his mother, made efforts to get help for his wrongful incarceration, but they

25  were unsuccessful:

26      a.  On September 5, 1999 Wilson wrote to the LAPD to lodge an official

27          complaint about Marks' misconduct in his case. On November 20,

28

2000, an LAPD Commanding Officer replied to Wilson's letter, stating that the matter had been investigated and found to be without merit.

b.  In 2000, Wilson's mother, Ms. Margie Davis, wrote a letter to the Los Angeles County District Attorney's Office Bureau of Special Operations on behalf of her son.

c.  In 2001 Wilson wrote a letter to the Centurion Ministries in New Jersey requesting to investigate his case.  In 2002, Ms. Davis followed up on his behalf but Centurion Ministries declined to help.

d.  In 2001 Ms. Davis submitted his case to the California Appellate Project.  The case was declined in March 2001.

e.  In 2003, Ms. Davis wrote to governor Gray Davis.

f.  In 2003, Ms. Davis wrote to the congressman for the 41st District of California, Jerry Lewis.

g.  On July 17, 2003, Ms. Davis wrote to the Los Angeles District Attorney's Office Justice System Integrity Division.  Head Deputy Richard Doyle responded on August 29, 2003 in part that "I have contacted LAPD and have been informed that their investigation failed to corroborate your allegations."  The District Attorney's Office "closed their file" and took "no further action."

h.  In 2006, Ms. Davis again submitted the case to the California Appellate Project and was declined in June 2006.

i.  In 2006 and 2007, Ms. Davis wrote to congressman Diane Watson.  In 2006 Ms. Davis wrote to the California State Senator for the 26th District, Kevin Murray.

j.  In 2006, Ms. Davis wrote to the Missouri State Senator for the 13th District, Timothy P. Green.

k.    In 2006, Ms. Davis wrote to the congressman for the 1st District of Missouri, Lacy Clay.

l.    On June 22, 2006 Ms. Davis complained to the LAPD of misconduct in Wilson's case.

m.    On July 5, 2006, Ms. Davis wrote to the Florissant Police Department in Florissant, Missouri where she was residing at the time.

n.    On February 5, 2007, Captain Jeri Weinstein of the Criminal Investigation Division wrote to Ms. Davis stating "Your allegation of *Unbecoming Conduct* has been adjudicated as *Non-Disciplinary*, which means the employee's actions did not rise to the level of misconduct. On June 16, 2008, Ms. Davis contacted the Office of the Inspector General requesting that the Los Angeles Police Commission conduct an independent review of her complaint regarding misconduct by the LAPD in Wilson's case.

**B.    PRO SE WRITS OF HABEAS CORPUS**

128.    On May 7, 1990, Wilson filed a pro se petition for writ of habeas corpus in the United States District Court, which was denied. This petition was denied because there was no evidence in the record regarding when Marks directed Bishop's attention to Wilson. (This is discussed in § VII (A).)

129.    Wilson filed petitions in the California Supreme Court on March 22, 1994, July 18, 1994, and May 16, 2001 which were denied on May 25, 1994, September 7, 1994, and October 31, 2001, respectively. He also filed a petition in the California Court of Appeal, which was denied on April 24, 2001.

130.    On September 23, 2013, Wilson filed another *pro se* petition in the Superior Court claiming "newly discovery evidence." Wilson indicated in his petition that, while assisting another inmate with his legal work, he discovered Bishop was given $1,000 by the LAPD. The court denied the petition and Wilson

filed a motion for reconsideration. The court had not yet ruled on the motion when Wilson filed a fourth *pro se* petition on November 22, 2013 asking the court to strike the special circumstances allegation to allow him an opportunity for parole. On December 6, 2013, the court denied the motion to consider the third writ as well as the petition he filed on November 22, 2013.

### C. NEW EVIDENCE FROM OTHER SOURCES

131.   In March 2009, Wilson filed a motion for discovery pursuant to Penal Code 1054.9. On April 1, 2009, the Superior Court granted his motion and ordered production of certain relevant categories of documents. One year later, on June 23, 2010, the District Attorney's Office produced the murder book. On information and belief, this copy of the murder book reflected the "LAPD copy" or the copy that Marks would have had in his possession during the investigation and trial of Wilson, as opposed to the "DA Copy" containing only the materials the District Attorney's Office was provided by Marks.

132.   In 2012, when Wilson was assisting a fellow inmate, Horace Burns, with his legal work, he learned that Burns' attorney had obtained discovery reflecting a $1,000 payment made by the LAPD to Bishop in connection with Wilson's case.

133.   In 2014, a Federal Public Defender contacted Wilson advising of another unrelated case, *Tizeno v. Janda*, which involved allegations that Det. Marks coerced a witness to falsely identify a suspect in a criminal investigation

### D. LOYOLA LAW SCHOOL PROJECT FOR THE INNOCENT'S REPRESENTATION OF WILSON AND WILSON'S RELEASE FROM CUSTODY

134.   On August 1, 2016, the Loyola Law School Project for the Innocent (herein "LPI") filed an Amended Petition for Writ of Habeas Corpus alleging multiple due process violations and that Wilson was actually innocent. The court issued an order to show cause on November 15, 2016. The Los Angeles District

Attorney's Office filed a return on December 30, 2016. The LPI filed a traverse on January 31, 2017. On March 8, 2017, the District Attorney's Office wrote a letter to Hon. Laura F. Priver conceding that cumulative errors during pretrial and trial proceedings deprived Mr. Wilson of his constitutional right to a fundamentally fair trial and stated its intention not to retry Wilson after his convictions were vacated. Wilson was released from custody on March 16, 2017.

135.   During the habeas litigation LPI and the members of the District Attorney's Office interviewed Marks. During this interview Marks admitted that, throughout his career as a LAPD detective, he routinely coached witnesses as they viewed photo line-ups by directing their attention to certain suspects and asking the witness to comment regarding why that suspect was not the perpetrator, and that he knew it was improper to do so.

136.   Marks also revealed during his interview that he constructed photo line-ups without attempting to select photos that resembled the witnesses' physical description of a suspect – as he did in this case. This practice violates a cardinal rule of constructing non-suggestive photospreads, which are supposed to contain photos of people matching the general description of the perpetrator.

137.   Marks stated that he did the above despite *knowing* that such practices risked resulting in tainted IDs. He also admitted that *he knew* the procedures he routinely employed over the course of his career were <u>not</u> sanctioned by the LAPD and that they can lead to tainted identifications, and would therefore likely be challenged in court, but he did it anyway.

138.   On information and belief, Marks would include information somewhere in a secondary document (often, as here, never given to the defense or if given buried in a document) referring to his actions in influencing witnesses. At the same time, he would write descriptions of the identifications without describing his

conduct in influencing the identification, intentionally giving the false and misleading impression that the identification occurred without him influencing it.

### E.   NEW EVIDENCE THAT THE MEN PACE SAW RUNNING COULD NOT HAVE COMMITTED THE HANSON MURDER

139.   Prior to trial, while Clarence Pace was in jail for an unrelated case, Marks picked him up and took him around the neighborhood where the crime occurred.  At that time, Pace told Marks that, after he saw the two men run past him, he went to his friend Gwen's apartment that was located on the north side of W. 22nd Street between La Salle and Hobart.

140.   Pace told Marks that, when he stopped at Gwen's house, she was not home so Pace left after just a minute or two.  That was not accurate. The purpose of Pace's visit to Gwen was to purchase a grey suit from her that he heard she shoplifted.  He spent between five and ten minutes talking to Gwen in her apartment and buying the suit. (As he was leaving Gwen's apartment, he realized he didn't bring any money with him and could not purchase the suit.)  Pace told Marks that no one was home at Gwen's apartment and that he was only there for a minute or two; he did not tell Marks that he went inside Gwen's apartment for five to ten minutes. He provided this description because he didn't want to involve Gwen or implicate her in shoplifting.

141.   After Pace left Gwen's apartment he went to Hobart Street and walked south.  He saw the flashing lights of the emergency vehicles (responding to Hanson's murder) and wanted to investigate.  He got to Hanson's truck shortly before Hanson was pronounced dead.  He saw one of the paramedics leaning in the truck and working on Hanson before saying there was nothing they could do to save him.

142.   Pace reviewed Marks' trial testimony where Marks stated that Pace would have gotten from the location where he saw the two men run past him at La Salle and W. 23rd Street to Hobart where he saw the flashing emergency lights in

five or six minutes.  In fact, Pace was at Gwen's apartment alone for at least that long.

143.   Pace saw the two men approximately .3 miles from the murder scene. Other than running there was no other evidence connecting them to any wrongdoing (no weapon, bloody clothing, etc.), and the description of their clothing did not match the description of the assailants' clothing provided by Bishop.

144.   The chronology of events was essential to supply any connection between the two men Pace saw and the Hanson murder.  If the chronology did not work, then the identification was of little evidentiary value (especially given Pace's lack of certainty, his short observation time and the mismatched clothing). The prosecutor stated during closing argument, "We have this timed, right?...It is important if you can fit it together."  The prosecutor presented a relatively straightforward timeline based on the assumptions that Pace saw both the paramedics and Arthur Hanson at the murder scene and it took approximately 10 minutes from the time of the murder for each of them to arrive at the scene after the murder.   Specifically, "the time that takes these guys [the assailants] to run from the scene of the crime to where Clarence Pace is, plus his time to get back over there, is five minutes and 45 seconds plus.  It was somewhere, again, close to 10 minutes; isn't it?" From this chronology, the prosecutor concluded that *"[s]o we know by the timing involved* that the two people that ran by Clarence Pace were in fact the people who came from the scene of the crime." (Emphasis added.)

145.   The above timeline, however, is completely reliant on the calculation that after seeing the two men, Pace walked to the murder scene in five minutes and 45 seconds – including *a one minute* stop at Gwen's apartment.  Since in fact Pace stayed at Gwen's apartment for 5-10 minutes in addition to the time it takes to walk to the scene, the prosecution's theory simply no longer "fits together."  Rather, it is much more likely that Pace saw the two men running .3 miles from the scene *prior*

1  *to* or at a minimum around the time the murder occurred, eliminating them as
2  suspects.

3  **IX.    LOS ANGELES COUNTY DISTRICT ATTORNEY CUSTOM AND**
4  **PRACTICE OF FAILURE TO TRAIN AND SUPERVISE AND**
   **ALLOWING THE PRESENTATION OF SUPPRESSED AND FALSE**
5  **EVIDENCE**

6       146.    The District Attorney's Office had a custom, policy and/or practice of
7  acting with deliberate indifference to defendants' due process rights by failing to
8  have adequate administrative systems or policies, and/or failing to train its
9  personnel, regarding a) the suppression of critical impeachment and Brady evidence,
10 b) preventing the presentation of false evidence and c) ensuring that eyewitness
11 identification procedures were reliable and not the result of suggestive activities by
12 law enforcement. These failures were particularly evident in serious felony cases
13 where the evidence against the defendant was otherwise weak. The Los Angeles
14 District Attorney's Office was able to obtain convictions in these "tough cases" as a
15 result of these systematic failures.

16      147.    For example, in 1979, members of the Los Angeles District Attorney's
17 Office suppressed exculpatory evidence and relied on false testimony to convict
18 Kash Delano Register, just 18 years old, of a murder he did not commit. He spent
19 over 34 years in prison until it was finally revealed that the prosecutors at the
20 District Attorney's Office had failed to produce impeachment and exculpatory
21 evidence to the defense at the time of trial, among other errors.

22      148.    In 1980, members of the Los Angeles District Attorney's Office relied
23 on testimony by a key jailhouse informant witness, Edward Floyd Fink, to convict
24 Thomas Goldstein of murder. Fink falsely testified that he received no benefits for
25 his testimony even though he pled guilty and received a District Attorney
26 recommendation of a maximum of County Jail time in a pending Grand Theft case,
27 which recommendation was conditioned on Fink subsequently providing

28

satisfactory testimony in the Goldstein murder case. His plea and its terms, though known to some members of the District Attorney's Office, were not known by the trial prosecutor and were never disclosed to the defense.

149.    In 1981, members of the Los Angeles District Attorney's Office relied on testimony by a key witness, William Acker, known to be mentally unstable and a serial liar, to obtain a conviction against Jesse Gonzales, who was sentenced to death. It was discovered decades later that the Los Angeles District Attorney's Office had in its possession at the time of trial six psychological reports prepared by prison psychologists indicating that Acker had a severe personality disorder and was possibly schizophrenic, which were not disclosed to the defense prior to or at the time of trial.

150.    Members of the Los Angeles District Attorney's Office knowingly used false testimony by serial informant Leslie White in a 1981 pre-trial proceeding in *People v. Bonin*, a capital case. Mr. White was subsequently rewarded with multiple furloughs from jail and a reduced sentence, but those benefits were never disclosed to the defense. Although at least some members of the Los Angeles District Attorney's Office were aware that Mr. White was willing to present false testimony even against defendants facing the death penalty, members of the Los Angeles District Attorney's Office continued to use Mr. White as a key prosecution witness in other cases, such as the case against Michael Moore, who was tried for a murder of a police officer that occurred in 1982. Although members of the Los Angeles District Attorney's Office systematically provided benefits to Mr. White after his testimony in these cases, he was presented as a prosecution witness and permitted to falsely testify in Moore's case that he was not receiving any benefits in exchange for his testimony, even though he was.

151.    In 1982, Adam Miranda was convicted of first degree murder with a robbery murder finding and sentenced to death. In 2008, his sentence was vacated

1   when the California Supreme Court determined that members of the Los Angeles

2   District Attorney's Office failed to disclose material exculpatory evidence to the

3   defense in the form of numerous items of evidence pointing to the prosecution's

4   witness, Joe Saucedo, as having confessed to killing the victim. At Miranda's trial,

5   Saucedo testified that Miranda had killed Hosey and that Saucedo had tried to stop

6   him. None of the evidence impeaching Saucedo was disclosed to the defense at the

7   time of Miranda's trial.

8          152.   In 1982, James Shortt was convicted, largely on the basis of the

9   testimony of notorious jailhouse informant Stephen Cisneros, who (as he later

10  testified) presented false evidence that Mr. Shortt had made incriminating

11  statements to him in exchange for which he received sentencing benefits, which

12  benefits were known to members of the Los Angeles District Attorney's Office and

13  never disclosed to the defense. Members of the Los Angeles District Attorney's

14  Office also failed to disclose psychiatric testimony, a psychiatric report, and two

15  probation reports negatively reflecting on Cisneros's credibility. On October 16,

16  2009, the Ninth Circuit overturned Mr. Shortt's conviction on the basis that

17  material, exculpatory information concerning Mr. Cisneros had not been disclosed.

18         153.   In 1983, members of the Los Angeles District Attorney's Office

19  prosecuted Anthony Stacy on three counts of first-degree murder by relying on

20  testimony by a witness whose FBI rap sheet revealed thirty arrests and convictions.

21  Nearly 20 years later, in 2002, the Court of Appeal found that the Los Angeles

22  District Attorney's Office had failed to disclose the obvious impeachment evidence

23  concerning the government's key witness and vacated Stacy's conviction. Tellingly,

24  the Los Angeles District Attorney's Office explained that its policy at the time was

25  not to turn over FBI rap sheets, even those containing impeachment evidence

26  valuable to the defense, unless the defense specifically requested it.

27

28

154.    In 1984, the Los Angeles District Attorney's Office charged Bobby Maxwell with murdering ten men in downtown Los Angeles. Maxwell was convicted largely on the testimony of a witness, Sidney Storch, who the prosecution knew or should have known was a rampant liar. A federal court reversed Maxwell's conviction 25 years later, in 2009, when it was discovered that members of the Los Angeles District Attorney's Office had suppressed impeachment evidence concerning the details of the key witness's plea negotiations, which evidence established that Storch was sophisticated and contradicted the naivete he professed at trial. After Maxwell's trial, Storch went on to testify for the prosecution at two trials in 1985, *People v. Stephen Naquin* and *People v. Carl Jones*, and lied at both trials about the benefits he received for testifying in the Maxwell case, among other lies.

155.    In 1985, Barry Williams was convicted of first-degree murder and sentenced to death. A federal court overturned his conviction 35 years later, in 2016, after concluding that the prosecution relied on false testimony by an unreliable witness and that the prosecution failed to turn over to the defense critical information about a key eyewitness, which the court found "deeply troubling."

156.    In 1986, Plaintiff Andrew Wilson was convicted in this case and sentenced to life in prison without the possibility of parole, based on the testimony of Saladena Bishop, which the Los Angeles District Attorney's Office knew or should have known was false and unreliable, and regarding which various items of material evidence was withheld, as detailed above. The Deputy District Attorney's failure to disclose critical impeachment evidence about Bishop's reported history of drug use and prior assaults on the victim, filing of a false police report and Marks' wrongful identification conduct detailed above, among other due process errors, caused the District Attorney's Office to concede that Wilson was deprived of his right to a fair trial and he was ordered released after 32 years in prison.

157.    In 1989, the Los Angeles District Attorney's Office charged Gerald Atlas with attempted murder and conspiracy to commit murder based on the testimony of an eyewitness, Galvez, whom the prosecution knew had a year earlier pled guilty to felony murder, been placed on probation, and then violated her probation. Atlas was convicted and sentenced to 28 years to life in prison. 1n 1998, Atlas's conviction was vacated following post-conviction proceedings in which Atlas presented evidence showing that the prosecution failed to turn over impeachment evidence to the defense concerning Galvez's prior conviction at the time of trial.

158.    In 1992, Michael Smith and Timoth Gantt were arrested for the stabbing murder of a college student. Sterling Norris, the same deputy district attorney who knowingly permitted Leslie White to testify falsely in the Bonin case in 1981, filed charges based almost entirely on a statement by an in-custody witness, David Rosemond, who said he had seen the attack on the student. Smith and Gantt were convicted and sentenced to life in prison without the possibility of parole. In a post-conviction evidentiary hearing, Rosemond recanted his identification and said he was coerced by police to identify Gantt and Smith. A federal judge found that material evidence had not been disclosed to the defense and set aside Gantt's conviction. Smith's conviction was also vacated.

159.    In 1995, Obie Anthony was convicted of murder. In 2011, the Los Angeles County Superior Court found that a "sweetheart" deal was given to the prosecution's key witness, John Jones, "an inherently unreliable witness," in his own prosecution for pimping and pandering, as an undisclosed "quid pro quo" for his testimony against Mr. Anthony. Both police and members of the Los Angeles District Attorney's Office denied the existence of the quid pro quo deal and concealed the benefits received by John Jones in return for his testimony. At Mr.

Anthony's trial, John Jones testified falsely that he did not receive any special consideration, which testimony the prosecutors knew to be false.

160. Consistent with and further illustrating the Los Angeles District Attorney's Office custom, policy and practice of deliberate indifference to defendants' due process rights, the Report of the 1989-90 Los Angeles County Grand Jury ("Report") concluded that the District Attorney's Office had an unchecked and uncontrolled custom, policy and practice of permitting individual prosecutors to extend benefits to witnesses who testified for the prosecution, even when it was known that the witnesses were providing false evidence.

161. The Report focused on prosecutors' use of unreliable informant testimony and concluded that between 1979 and 1990, "the Los Angeles District Attorney failed to fulfill the ethical responsibilities required of a public prosecutor by its deliberate and informed declination to take the action necessary to curtail the misuse of jail house informants." The "misuse of jail house informants" is merely another way of saying "knowingly presenting unreliable and fabricated evidence," and "failing to disclose impeachment evidence regarding those witnesses as required under Brady." The core constitutional violation is one and the same.

162. Trial transcripts and appeals from numerous serious felony convictions obtained during that same time period show that the systematic unethical and illegal conduct by members of the Los Angeles District Attorney's Office's described by the Report was not limited to witnesses who were jailhouse informants. Members of the District Attorney's Office, throughout the 1980s—when Mr. Wilson was convicted—systematically and knowingly presented as a matter of policy testimony by unreliable key witnesses in serious felony cases, provided undisclosed benefits to those witnesses, and failed to turn over impeachment evidence to the defense about those key witnesses.

163.    That the serial use of false and fabricated evidence was a custom, policy and practice of the Los Angeles District Attorney's Office is demonstrated by the Grand Jury Report's finding that "[t]he investigation failed to identify a single case of prosecution of an informant for perjury or for providing false information, despite the fact that numerous cases of this nature were discovered during this inquiry."

164.    The Report makes clear that the District Attorney's Office was, as a matter of policy, deliberately indifferent to the constitutional rights of defendants in serious felony cases during the period when Mr. Wilson was tried and convicted. In 1987, when the District Attorney's Office discussed the issue of needing to create an index that documents information on prosecution witnesses whose reliability was questionable, "[n]either a defendant's right to know about information affecting the credibility of an informant, nor a prosecutor's obligation to disclose such information to a defendant, was ever mentioned during the discussion of the pros and cons of an informant index, according to all sources of evidence presented to the Grand Jury." The Report noted that the District Attorney's Office determined not to create a central repository of information on these prosecution witnesses because "the defense might discover the information in the index" and it may be determined that defendants' right to counsel was being violated by the prosecution's tactics.

165.    The Report also states that one management official at the Los Angeles District Attorney's Office explained that in his or her experience, "over the years in tough cases . . . where we have filed a case and we know the defendant did it, but the amount of available evidence is a little on the thin side, and a statement would be helpful, that sooner or later those statements become available to us." The representative of the District Attorney's Office added that this was "a fairly common practice." In other words, the common practice was that in tough cases where the evidence was thin, badly needed witness testimony would materialize—one way or

1 | another—to ensure that the District Attorney's Office obtained the convictions it
2 | sought.

3 |      166.    Prior to Mr. Wilson's trial, DDA Aalto determined that the case against
4 | Mr. Wilson was "shaky." Consistent with the custom, policy and practice in place at
5 | that time, DDA Aalto presented Ms. Bishop's unreliable statements and
6 | identification implicating Mr. Wilson, even though she knew Ms. Bishop was not a
7 | credible witness and even though a) she knew Ms. Bishop had filed a false police
8 | report against Horne prior to Mr. Wilson's trial and was therefore not a credible
9 | witness and b) Aalto had obtained evidence from Hanson's friend, Earl Martin,
10 | indicating that Ms. Bishop had stabbed Hanson on past occasions in a manner
11 | consistent with the wounds inflicted on Hanson the night he was killed--information
12 | which was never investigated.

13 |      167.    Providing the information to allow the defense a full and fair cross-
14 | examination of government witnesses whose testimony is important to the outcome
15 | of the case is critical to due process. The suppression of material impeachment
16 | evidence, particularly for key state witnesses, often requires the reversal of a
17 | conviction or the vacating of a sentence, but such violations typically take decades
18 | to uncover. The violations that have been uncovered to date are not isolated cases.
19 | These cases provide strong evidence that there were customs, policies practices or
20 | failures in place whereby countless defendants were denied their due process rights,
21 | as Mr. Wilson was.

22 |      168.    In Mr. Wilson's case, as with many other cases involving serious
23 | felony convictions obtained in the 1980s and 1990's, critical impeachment evidence
24 | concerned key prosecution witnesses was not disclosed and remained buried in the
25 | trial prosecutor's file for 30 years, and false and misleading evidence was allowed to
26 | be presented. Exculpatory evidence was illegally suppressed pursuant to the District
27 | Attorney's Office's customs, policies practices and failures under which

28 |

1   impeachment evidence relating to key prosecution witnesses, who were known by

2   the prosecution to be unreliable, was not disclosed. This was particularly so in tough

3   cases, such as Mr. Wilson's (which Ms. Aalto said she considered shaky and

4   expected to lose) where the evidence was thin, particularly if that evidence showed

5   payments, benefits, or favors to key witnesses by law enforcement or by the D.A.'s

6   Office, or that a prosecution key witness was unreliable or lacked credibility, or

7   both.

8       169.    As the foregoing recitation of known cases (there are, by definition,

9   many more that are not known) demonstrates, the Los Angeles District Attorney's

10  Office, throughout the 1980's and 1990's, systematically failed to have systems or

11  established policies in place, and to train and supervise its attorneys, to prevent the

12  use of false evidence and to require the full and prompt production of exculpatory

13  evidence to the defense. It similarly failed to ensure that trial attorneys knew,

14  learned of and disclosed exculpatory evidence; to provide the means and

15  information to determine whether evidence was reliable; to ensure that its trial

16  attorneys learned all important information for a case, including exculpatory

17  evidence. Throughout this period, it had no established policies, systems, training or

18  supervision for meeting constitutional standards for a) turning over exculpatory

19  evidence, b) preventing the presentation of false evidence. c) ensuring that

20  eyewitness identification procedures were not suggestive and were reliable or d)

21  tracking evidence it was constitutionally obligated to learn and disclose.

22      170.    All of the foregoing customs, policies practices and failures occurred

23  with deliberate indifference to the rights of criminal defendants, including Plaintiff

24  Wilson, and even though members of the supervisory staff of the District Attorney's

25  Office, including Ira Reiner (the District Attorney at the time of Mr. Wilson's

26  conviction) were or should have been aware of these customs, policies practices and

27  failures.

28

171.    These customs, policies practices and failures were so closely related to the deprivation of the plaintiff's rights as to be a moving force that caused his wrongful conviction. Due to these customs, policies, practices and failures, DDA Aalto explained recently that she would not have disclosed to the defense any of the impeachment evidence she obtained that showed how unreliable Ms. Bishop was because "she never had any credibility anyway." Had DDA Aalto been properly trained and supervised, and had there been proper systems and policies in place, she would have known that that view is contrary to her constitutional obligations, and such disclosures would have been routine practice.

## X.    PARTICIPATION, STATE OF MIND AND DAMAGES

172.    All Defendants acted without authorization of law.

173.    Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them. Each defendant ratified, approved or acquiesced in the violations alleged herein.

174.    As joint actors with joint obligations, each defendant was and is responsible for the failures and omissions of the other.

175.    Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiff's rights.

176.    Each Defendant acted with a deliberate indifference to or, reckless disregard for, an accused's rights or for the truth in withholding evidence from prosecutors, and /or for the Plaintiff's right to an eyewitness identification free from improper suggestion, and/or for the Plaintiff's right to due process of law.

177.    As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Plaintiff has suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety,

shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

178.   Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish as well as mental and physical pain and injury. For such injury, Plaintiff will incur significant damages based on psychological and medical care.

179.   As a further result of the conduct of each of these Defendants, Plaintiff has lost past and future earnings in an amount to be determined according to proof at trial.

180.   As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships, including not being able to get married and raise a family.

181.   The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiff, entitling Plaintiff to exemplary and punitive damages from each defendant other than defendants City of Los Angeles and County of Los Angeles in an amount to be proven at the trial of this matter.

182. By reason of the above described acts and omissions of Defendants, Plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

## XI.   FIRST CLAIM FOR RELIEF: 42 U.S.C. §1983 – *MANSON/BIGGERS* VIOLATIONS

### (Against Defendants Marks and Does 1-10)

183. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

184. Defendants Marks and Does 1 through 10, while acting under color of law, deprived Plaintiff of his civil rights by violating his right to have an eyewitness identification by Bishop that was free from suggestion or influence by police, as set forth in *Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972). The actions of each defendant in violating Plaintiff's right to have an eyewitness identification by Bishop that was free from suggestion or influence by police were done with deliberate indifference to and/or reckless disregard for Plaintiff's rights or for the truth.

185. A pre-trial identification violates due process where: (1) the identification procedures are impermissibly suggestive; and (2) the suggestive procedures give rise to a very substantial likelihood of misidentification, rendering it so unreliable that it was inadmissible. The identification here was highly suggestive, and indicia of reliability are completely missing:

    a.    Bishop's opportunity to observe was limited, as she was awakened from sleeping in the car to an attack, was looking initially towards the passenger side, it was dark, and she saw the assailants for only a few seconds.

    b.    Although Bishop knew Wilson, she never indicated this fact pre-identification. (Her prior knowledge/relationship with Wilson thereby made her particularly susceptible to suggestion that he was the assailant she saw because of phenomenon of transference where a face is familiar.)

    c.    Bishop initially saw one or more pictures of Wilson in the mug books and did not even tentatively identify him from those.

    d.    Bishop definitively identified a person as the passenger side assailant although that person had been in jail at the time, then identified Frederick Terrell and maintained that she was positive of the identification even though the prosecution later dismissed charges against him (in large part because Detective Marks had structured identification interviews to keep him as a suspect).

e.    The photospread from which Bishop chose Wilson did not follow proper procedure in that the photos were not chosen to reasonably resemble the description of the driver side assailant but rather to contain photos of persons whose names had come up in the investigation.

f.    When she still did not tentatively point to Wilson, Detective Marks pointed Wilson out (in his words, "directed" her to him), and only then did she make what Marks recorded as an 80% identification.

g.    The subsequent live lineup was tainted not only by the foregoing tainted photographic identification, but by the fact that, at the live lineup, Wilson was the only person with a gold tooth, making him stand out and completely distinctive, in addition to the fact that he was the only person Bishop previously had seen in photo array.

186. The constitutional source of the obligation to conduct eyewitness identifications free from improper suggestion or influence is the due process clause of the Fifth and Fourteenth Amendments. Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as a procedural, or alternatively as a substantive, due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to eyewitness identifications free from improper suggestion or influence is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

187.  Defendants' acts of improper suggestion and influence include, but are not limited to: 1) the conduct of the defendants constructing a photo line-up based on criteria other than whether the individuals depicted bear any resemblance to the physical description of the suspect provided by the viewing witness, 2) directing Bishop to Wilson's photo after she was unable to identify him as a suspect without the improper suggestion and/or 3) other acts by Marks in providing information to Bishop or suggesting or implying information or answers to questions.

188. Without Bishop's tainted and unreliable identification, there was insufficient evidence as a matter of law to convict Wilson. Clarence Pace did not make a positive identification and in any event did not purport to identify the person who murdered Christopher Hanson. Vincent Sanders never testified under oath to hearing any incriminating statement from Wilson, but rather testified under oath that he never heard them and was coerced and threatened by Detective Marks. Thus, Sanders' initial (and recanted) identification of Wilson was the result of pressure and intimidation by Marks to Sanders.

189. Defendants Marks and Does 1-10 were each jointly and severally responsible to ensure that any identification procedure was free from suggestion or influence by police, and violated that responsibility. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein, and ratified, approved or acquiesced in it.

190. As a result of defendants', and each of their, violations of Wilson's constitutional rights as alleged above, Wilson was damaged as alleged above.

## XII. SECOND CLAIM FOR RELIEF: 42 U.S.C. §1983 – *BRADY* VIOLATIONS

### (Against Defendant Marks and Does 1-10)

191. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

192. Defendant Marks and Does 1-10, while acting under color of law, deprived Plaintiff of his civil rights by violating his right to have material exculpatory evidence and information as required by *Brady v. Maryland*, 373 U.S. 83 (1963) (hereafter *Brady* information) turned over to the prosecutors handling his case so that it could in turn be provided to the Wilson defense.

193. The actions of each defendant in withholding evidence from prosecutors were done with deliberate indifference to or reckless disregard for Plaintiff's rights or for the truth.

194.  Marks' and Doe Defendants' *Brady* violations (limited in this claim to information not provided to the trial DDA Aalto) asserted herein encompass, but are not limited to:

a.      Failure to disclose Defendant Marks role in and timing of "directing" Bishop to Wilson's picture during her identification;

b.      Failure to disclose that Defendant Marks buried information regarding Bishop's identification and his directing her to Wilson in his Ramey warrant affidavit, along with his failure to include it in any reports he authored or in the Chrono (even though he inserted a description into the Chrono of that identification that omitted any reference to his directing Bishop to Wilson);

c.      Failure to disclose Marks' highly suggestive line-up procedures, used knowingly and routinely by him throughout his career in violation of LAPD's procedures and policies;

d.      Failure to disclose that Bishop received a $1,000 payment prior to giving testimony at trial.

e.      Failure to correct Bishop's testimony at trial that provided the false and misleading impression that she made her identification of Wilson immediately after seeing the photospread with his photo in it and without any outside influence.

f.      Failure to correct Bishop's testimony at the preliminary hearing that she had no trouble picking out Wilson from the photospread.

g.      Failure to disclose before or during trial that his partner on the case, Detective Bunch, did not believe in the case because he did not consider Bishop to be a reliable witness.

h.      Failure to disclose that Marks had the habit and custom of influencing eyewitness identifications and directing or focusing eyewitness attention on those he considered suspects.

i.      Failure to disclose Marks' custom, habit, pattern and practice of burying exculpatory information, particularly regarding his identification practices.

j.      Failure to disclose that Marks influenced or pressured witnesses identified in police reports and relied on by the prosecution, including Bishop, Pace and Sanders.

k.      Failure to disclose that Marks routinely abused his position and violated citizens' rights by rousting, harassing or stopping them without lawful cause (for example, by approaching individuals on the street, yanking jewelry from their person and throwing it into the sewer, which Marks has admitted regularly doing).

195. The constitutional source of the obligation to provide *Brady* information is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to *Brady* information is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

196. Defendant Marks and the other Doe defendants were each jointly and severally responsible to provide *Brady* information to the prosecutors handling the Wilson case so that it could in turn be provided to the Wilson defense. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

197. As a result of defendants', and each of their, violations of Wilson's constitutional right to have *Brady* information turned over to the prosecutors handling his case, Wilson was damaged as alleged above.

## XIII.   THIRD CLAIM FOR RELIEF: 42 U.S.C. §1983 – FALSE EVIDENCE VIOLATIONS

### (Against Defendants Marks and Does 1-10)

198. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

199. Defendant Marks and Does 1-10, while acting under color of law, deprived Plaintiff of his civil rights, more particularly, his right to due process of law, by providing or causing to be provided false evidence that resulted in a deprivation of liberty because they set in motion a reasonably foreseeable chain of events leading to the presentation of false evidence at Plaintiff's preliminary hearing and trial, his conviction and incarceration.

200. The false evidence asserted herein is comprised of material omissions as well as affirmatively false and misleading statements in police reports and documents prepared in connection with the investigation in the Christopher Hanson murder. It includes:

a.      Marks' specific direction of Bishop's attention to Wilson after she had failed to identify him constituted a direct fabrication of evidence; was intended to, and did, manipulate Bishop into falsely identifying Wilson as the driver side assailant; or alternatively was done with a reckless disregard for the truth of whether Wilson was in fact the assailant.

b.      The omission from any arrest or other police report or the Chron reference to Mark's role and activity in directing Bishop to identify Wilson after Bishop failed to make an identification and describing that Bishop made an identification independently, thereby falsely communicating that she made a reliable and independent identification;

c.      Causing and influencing Bishop to falsely imply, and provide the false and misleading impression, that she easily made her identification of Wilson immediately after seeing the photospread with his photo in it, without any outside influence;

d.      Causing and influencing Bishop to identify Wilson by using investigative techniques that Defendants knew or should have would yield false information.

e.      Falsely stating in the Murder Book that Wilson's attorney Mr. Barnes visited him at the police station and only requested certain items from the Murder Book.

201. Each defendant knew or should have known the evidence was false, and the defendants' conduct was done with deliberate indifference to and/or reckless disregard for Plaintiff's rights or for the truth.

202. The constitutional source against using false evidence is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to not have false evidence use against him is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

203. Defendant Marks and the other Doe defendants were each jointly and severally responsible to not use false evidence against Wilson. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

204. As a result of defendants', and each of their, violations of Wilson's constitutional right to not have false evidence turned over to the prosecutors handling his case, Wilson was damaged as alleged above.

**XIV.      FIFTH CLAIM FOR RELIEF: 42 U.S.C. §1983 - *MONELL* VIOLATIONS (CITY)**

**(Against Defendant City of Los Angeles) –**

205. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

206. Defendant City of Los Angeles, by and through the Los Angeles Police Department, had the habit, custom, pattern and practice, through the ongoing activities of Detective Marks' during the many years of his term as an LAPD officer, of:

a.   improperly influencing eyewitness identifications by pointing out, or through various means directing their attention and focus to, persons considered suspects in an investigation.

b.   failing to disclose exculpatory evidence, particularly regarding Detective Marks' conduct to influence eyewitness testimony during eyewitness identification interviews and procedures.

c.   burying exculpatory material in obscure places in a file where it was unlikely that, even if the documents were disclosed to the prosecution or the defense, they would be missed.

d.   putting exculpatory evidence in a Ramey warrant with the knowledge that such a warrant would not be disclosed to the defense, thereby creating a substantial likelihood that it would not be seen or noticed by the defense, increasing the likelihood that it would never become an issue that the defense would raise.

e.   not including exculpatory evidence in the key case reports and documents, in the hope and expectation that it not be noticed or raised by the defense.

f.   Improperly taking personal property he believed to be evidence from individuals on the streets.

207. Plaintiff is informed and believes and thereon alleges that, during the many years of Detective Marks' term as an LAPD officer, Defendant City of Los Angeles, by and through the Los Angeles Police Department, knew or should have

known of the foregoing custom, pattern and practice of Detective Marks and turned a blind eye to it.

208.  Plaintiff is informed and believes and thereon alleges that, during the many years of Detective Marks' term as an LAPD officer, Defendant City of Los Angeles, by and through the Los Angeles Police Department, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and Defendants, including Plaintiff, had no established or clear policy, did not provide adequate training and supervision, and/or otherwise failed to carry out their responsibilities regarding the following issues:

a.  a basic and standardized *Brady* policy that outlines and identifies the *Brady* obligations of officers;

b.  ensuring that all exculpatory evidence was prominently communicated in a manner likely to ensure that it would be seen and understood by both the prosecution and defense;

c.  ensuring that its police officers provided its full investigative material in a case submitted to the District Attorney's Office, including but not limited to Ramey warrant materials and any investigative materials or notes;

d.  ensuring that all exculpatory evidence was referenced in the key case reports and documents, especially those summarizing the evidence;

e.  ensuring that officers who hear false testimony call that fact to the attention of the prosecutor;

f.  ensuring that officers regularly memorialize false witness statements false reports, and that the Los Angeles Police Department maintains a system where such false statements (e.g., Bishop's false rape accusation) are made known and available to the detectives and the

prosecutors in any case where that person who previously made a false statement is a witness in a subsequent investigation or prosecution;

g.   ensuring that the interactions between a witness and a detective are fully and completely provided in a prominent written report;

h.   ensuring that eyewitness identification procedures complied with the requirements of due process, including those set out in *Manson v. Braithwaite* and *Neil v. Biggers*;

i.   ensuring that police personnel, whether through inadvertence or design, did not provide information to potential eyewitnesses that influenced the identification;

j.   preventing the use of suggestive eyewitness identification procedures;

k.   ensuring that eyewitness identifications were reliable and free of improper influence;

l.   preventing false evidence by omission of material information;

m.   preventing the use of misleading descriptions of events that provide a false impression;

n.   establishing procedures to ensure that activity in related court cases but with a different case number (e.g., Ramey warrant cases or cases where a witness had pending charges) were treated as exculpatory evidence and forwarded prominently to the District Attorney's Office and the trial Deputy District Attorney;

o.   establishing procedures to ensure that any benefits or monies paid to or for the benefit of witnesses were treated as exculpatory evidence and forwarded prominently to the District Attorney's Office and the trial Deputy District Attorney;

p.   ensuring Detectives' compliance with constitutional standards regarding false evidence, *Brady* or eyewitness identification procedures;

q.   establishing procedures or systems to track or identify known false witness statements or other known facts that would make them unsuitable as witnesses in other cases or would be exculpatory evidence undermining their credibility if they were used as witnesses;

r.   establishing procedures to ensure that any evidence pertinent to habeas claims contained in its files (e.g., the Marks' affidavit establishing that Marks pointed Wilson out to Bishop before she ever identified him as the assailant) are discovered and produced to the District Attorney's Office, the petitioner and the Court;

s.   adequately investigating incidents involving the fabrication of evidence, wrongful influence of identifications, suppression or burying of exculpatory information or other misconduct by its deputies, or complaints of such conduct;

t.   conducting investigations in such a manner as to conceal the misconduct of its officers.

u.   condoning and encouraging the fabrication of evidence, including but not limited to the presentation of materially false investigative reports, the use of perjurious informants, and/or the use of false statements in their prosecutions

209. The foregoing actions, omissions and inactions of the Los Angeles Police Department were known or should have been known to the policy makers responsible for the Los Angeles Police Department and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training and supervision was obvious.

210. The actions of the Los Angeles Police Department set forth herein were a moving force behind the violations of Wilson's constitutional rights as set forth in this complaint.

211. As a direct and proximate result of Defendant City of Los Angeles' acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of Defendants Marks and Does 1 - 10 acts and omissions, Plaintiff sustained injury and damage as alleged herein.

## XV. SIXTH CLAIM FOR RELIEF: 42 U.S.C. §1983 – *MONELL* VIOLATIONS (COUNTY)

### (Against Defendant County of Los Angeles)

212. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

213. Plaintiff is informed and believes and thereon alleges that, during all or portions of the period relevant to this case (1984 to 2017), and specifically including but not limited to the years 1985-86 (investigation and trial), Defendant County of Los Angeles, by and through the Los Angeles County District Attorney's Office, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and defendants, including Plaintiff, had a) no established or clear administrative system in place, b) no stated, written or adequate policies, and c) no or inadequate training and supervisions regarding, *inter alia*, the following issues:

    a. ensuring that the police department or police officers with which the District Attorney's Office was working provided all exculpatory evidence gathered during an investigation of a case presented to the District Attorney's Office for prosecution, as numerous cases over the years made clear was its obligation.

    b. ensuring that the police department or police officers with which the District Attorney's Office was working provided its full investigative

69

material and that material is actually reviewed by an appropriate Deputy DA.

c. ensuring that exculpatory evidence was not buried in files provided to the trial attorney handling the case by the police department or police officers with which the District Attorney's Office was working, and/or by members of its Office.

d. ensuring that information in related court cases relevant to a case being prosecuted was provided by the police department or police officers with which the District Attorney's Office was working to the trial attorney prosecuting that case and/or was disclosed to the defense.

e. ensuring that exculpatory information in related court cases relevant to a case being prosecuted was provided to the trial attorney prosecuting that case by the police department or police officers with which the District Attorney's Office was working and/or was disclosed to the defense.

f. ensuring that Ramey warrant materials contained in a case number different from a case being prosecuted was provided to the trial attorney prosecuting that case, particularly where the Ramey warrant materials include exculpatory information, and/or was disclosed to the defense.

g. ensuring that the police department or police officers with which the District Attorney's Office was working provided to the trial attorney prosecuting that case full and complete reports of the identification procedures and activities involved, including any conduct that might have tainted the identification, and/or that such information was disclosed to the defense.

h. ensuring that the police department or police officers with which the District Attorney's Office was working provided to the trial attorney

prosecuting that case full and complete reports of any benefits (including but not limited to benefits in the form of monetary or other pecuniary benefits and leniency in other charges) provided to any witness, and/or that such information was disclosed to the defense.

i.  ensuring that any benefits or monies paid to or for the benefit of witnesses was both known to the relevant people in the District Attorney's Office, including the attorney assigned to try the case, and/or disclosed to the defense.

j.  ensuring that false evidence was not being presented or relied upon by Deputy District Attorneys in prosecuting cases.

k. ensuring that eyewitness identifications on which prosecutors were relying complied with the requirements of due process, including those set out in *Manson v. Braithwaite* and *Neil v. Biggers*, were not unduly suggestive, and were reliable and free of undue influence.

l.  ensuring that the key police reports and other key case documents provided full and complete descriptions of witness interactions and called attention to any irregularities, deviations from policy or evidence favorable to the defense.

m. ensuring that exculpatory evidence learned or discovered after trial and conviction (including between trial and sentencing and after sentencing) was disclosed to defendants and their counsel.

n. ensuring that exculpatory information known to Deputy District Attorneys would be identified, organized and maintained for production to the California Attorney General's Office for litigation in subsequent post-trial habeas and appellate proceedings.

o. establishing procedures or systems to track or identify known false witness statements or other known facts that would make them

unsuitable as witnesses in other cases or would be exculpatory

evidence undermining their credibility if they were used as witnesses.

p. failing to discipline personnel involved in dishonesty, particularly in

enabling, encouraging, condoning or presenting false testimony that

was known or should have been known to be false or that was utilized

with a reckless disregard for, or deliberate indifference towards, the

truth and the rights of the accused.

q. establishing procedures so all exculpatory/impeachment evidence

discovered by law enforcement or the DA after the preliminary

hearing stage is provided to the defense.

r. establishing procedures so all exculpatory/impeachment evidence

discovered by law enforcement or the DA after a conviction is

provided to the defense.

214. Defendant County of Los Angeles, by and through the Los Angeles

District Attorney's Office, had the habit, custom, pattern and practice, during all or

parts of the relevant time period (1984 to the present) of:

a.   improperly influencing eyewitness identifications by pointing out, or

through various means directing their attention and focus to, persons

considered suspects in an investigation.

b.   failing to disclose exculpatory evidence, particularly regarding

Detective Marks' conduct to influence eyewitness testimony during

eyewitness identification interviews and procedures.

c.   burying exculpatory material in obscure places in a file where it was

unlikely that, even if the documents were disclosed to the prosecution

or the defense, they would be missed.

d.   putting exculpatory evidence in a Ramey warrant with the knowledge

that there was a substantial likelihood that it would not be seen or

noticed by the defense, thereby increasing the likelihood that it would never become an issue that the defense would raise.

e.   not including exculpatory evidence in the key case reports and documents, in the hope and expectation that it not be noticed or raised by the defense.

f.   entering into benefits agreements with key witnesses without disclosing them to the defense.

215. The customs, policies, practices, failures, actions and inactions of the Los Angeles District Attorney's Office elaborated above were or should have been known to the policy makers responsible for the Los Angeles District Attorney's Office and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training, supervision or discipline in areas where the need for such things to occur was obvious. Given the long and recurring history elaborated above, the Los Angeles District Attorney's Office and its policy makers were on notice of these deficiencies and failures.

216. The customs, policies, practices, failures, actions and inactions of the Los Angeles District Attorney's Office elaborated above were so closely related to the deprivation of the plaintiff's rights as to be a moving force that caused the constitutional violations alleged herein.

217. As a direct and proximate result of Defendant County of Los Angeles' acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of district attorney's acts and omissions alleged above, Plaintiff sustained injury and damage to be proved at trial.

218. As a result of defendants', and each of their, violations of Wilson's constitutional rights as set forth herein, Wilson was damaged as alleged above.

1

**XVI.        PRAYER FOR RELIEF**

2

WHEREFORE, Plaintiff, Andrew Wilson requests relief on his own behalf as

3

follows, and according to proof, against each Defendant:

4

1.      General and compensatory damages in an amount according to proof;

5

2.      Special damages in an amount according to proof;

6

3.      Exemplary and punitive damages against each Defendant, except the

7

City of Los Angeles and County of Los Angeles, in an amount according to proof;

8

4.      Costs of suit, including attorneys' fees, under 42 U.S.C. §1988; and,

9

5.      Such other relief as may be warranted or as is just and proper.

10

DATED: June 28, 2018                    Respectfully submitted,

11

KAYE, McLANE, BEDNARSKI &

12

LITT, LLP

13

BARRETT S. LITT

14

RONALD O. KAYE

15

KEVIN J. LaHUE

16

By: /s/ Barrett S. Litt_____

17

Attorneys for Plaintiff

18

Andrew Wilson

**JURY DEMAND**

19

Trial by jury of all issues is demanded.

20

DATED: June 28, 2018                    Respectfully submitted,

21

22

KAYE, McLANE, BEDNARSKI &

LITT, LLP

23

24

BARRETT S. LITT

RONALD O. KAYE

25

KEVIN J. LaHUE

26

By: /s/ Barrett S. Litt_____

27

Attorneys for Plaintiff

28

Andrew Wilson

74